UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. _____

JULIAN ROSS,
          Plaintiff

v.

BENCHLING, INC.
          Defendant

COMPLAINT AND DEMAND
FOR JURY TRIAL

1. Plaintiff Julian Ross brings this action against Defendant Benchling, Inc. for disability discrimination, failure to accommodate, retaliation, and unlawful surveillance and interception of communications in violation of federal law. Specifically, Defendant violated: (1) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, by discriminating against Plaintiff based on his disability and failing to provide reasonable accommodations; (2) the ADA, 42 U.S.C. § 12203, by retaliating against Plaintiff for requesting accommodations, asserting protected rights, and engaging in protected activity; (3) the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2615(a)(1), by interfering with Plaintiff's rights to job-protected leave and restoration; (4) the FMLA, 29 U.S.C. § 2615(a)(2), by retaliating against Plaintiff for exercising his right to medical leave; (5) the Federal Wiretap Act, 18 U.S.C. §§ 2511, 2520, by unlawfully intercepting and recording Plaintiff's telephone communications without knowledge or consent; and (6) the Stored Communications Act, 18 U.S.C. §§ 2701–2707, by unlawfully accessing, storing, and using Plaintiff's communications without authorization.

## Jurisdiction

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this

action arises under federal statutes, including the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.), the Family and Medical Leave Act (29 U.S.C. § 2601 et seq.), the Federal Wiretap Act (18 U.S.C. §§ 2511–2520), and the Stored Communications Act (18 U.S.C. §§ 2701–2707)

3. This Court has authority to award declaratory, injunctive, compensatory, punitive, statutory, and equitable relief pursuant to those statutes, including but not limited to 42 U.S.C. § 12117, 29 U.S.C. § 2617, 18 U.S.C. § 2520, and 18 U.S.C. § 2707.

4. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events and omissions giving rise to these claims occurred in Massachusetts, where Plaintiff was employed by Defendant.

## Parties

5. Plaintiff Julian Ross resides in Hampshire County, Massachusetts. At all relevant times, Plaintiff was employed by Defendant and performed work within, and for the benefit of, the Commonwealth of Massachusetts.

6. Defendant Benchling, Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 680 Folsom Street, 8th Floor, San Francisco, CA 94107, and employs over 100 employees. Defendant is registered to do business in Massachusetts and employs more than 100 individuals, qualifying as an "employer" in all statutes related to this action, including the ADA and FMLA.

## Factual Allegations

7. Plaintiff Julian Ross began employment with Defendant on or about June 21, 2021, in the full-time position of Sales Development Representative ("SDR") at Defendant Benchling, Inc., serving enterprise clients across various US and global territories.

8. Defendant Benchling is a cloud-based software platform for biotechnology research and development that provides software tools for the research and development of cutting edge therapeutics and pharmaceuticals. Its clients include multinational pharmaceutical companies and world-class academic institutions.

9. Plaintiff was classified as a non-exempt employee, with an hourly base wage of $31.25 and was also eligible to earn commissions and bonuses related to meeting certain performance metrics. The target annual incentive compensation was set at $30,000.00, with no cap on earnings. Additionally, he was granted incentive stock options (ISOs) as part of his employment contract, alongside a benefits package, as part of his employment agreement.

10. In or around March 2021, Benchling's SDR manager Christian Haas-Kwon personally recruited Plaintiff via LinkedIn.

11. Mr. Haas-Kwon represented to Plaintiff that Benchling was "doubling this year," that there was "lots of room to grow vertically or laterally," and that employment with Benchling offered "awesome perks and benefits," including unlimited PTO, wellness stipends, and advancement opportunities.

12. Beyond these specific assurances, Mr. Haas-Kwon emphasized Benchling's status as a rapidly scaling, venture-capital-backed pre-IPO company, portraying the position as a rare opportunity. He represented that joining Benchling would justify Plaintiff's leaving secure employment and would position him on a long-term trajectory of advancement and exceptional internal mobility.

13. Plaintiff reasonably relied on these representations in agreeing to enter the interview process, advancing through multiple interview rounds, and ultimately accepting employment with Benchling, rather than pursuing other external opportunities available at that time.

14. In January, 2022, Plaintiff notified Defendant of his need to take a medical leave of absence due to disabling health conditions including, but not limited to, depression, anxiety, and severe insomnia. Plaintiff was fully eligible for leave under the FMLA. Defendant approved the leave request, and Plaintiff applied for and was granted leave. In connection with his application, Plaintiff provided Defendant with a "Certification of Your Serious Health Condition" form dated February 6, 2022, completed by his health care provider. This form certified Plaintiff's need for continuous medical leave beginning January 24, 2022, and ending April 18, 2022.

15. Upon returning from medical leave on April 18, 2022, Plaintiff was informed that he would be assigned new sales accounts effective May 1, 2022, the start of the second fiscal quarter.

16. Between April 18 and May 1, Defendant barred Plaintiff from resuming core duties, working active accounts or earning commissions. Although Plaintiff had been medically cleared and was fully prepared with a planned return date of April 18, Defendant instructed him to wait until May 1 to regain access to commission-earning responsibilities and resume normal work functions.

17. Shortly after returning to work, Plaintiff informed Defendant that his healthcare provider had advised he may require intermittent medical leave in the future but that no specific dates had been identified. Plaintiff made clear that he would notify Defendant promptly should the need arise.

18. On or about May 11, 2022, Plaintiff formally notified Defendant that his physician had prescribed intermittent leave on an as-needed basis. Plaintiff also provided a written accommodation request from his healthcare provider recommending continued remote work

flexibility to manage his medical conditions. Plaintiff was eligible for such leave under the FMLA.

19. Defendant approved the remote work accommodation. This occurred during a period in which Defendant was transitioning employees from remote to in-office work. Plaintiff's work-from-home status, although medically justified, distinguished him from many of his peers.

20. In or around July 2022, Defendant held a cross-office Sales Development Representative ("SDR") meeting over Zoom, led by Director of Sales Development Sean Simerly, with SDRs from Boston, San Francisco, and Zurich. The purpose of the meeting was to address widespread employee dissatisfaction with Defendant's return-to-office ("RTO") policies. Unlike most other teams at Benchling, which were subject to a flexible and scarcely enforced three-day in-office expectation, SDRs were uniquely, and for unexplained reasons, required to be physically present in the office at least four days per week—ideally five—according to Mr. Simerly. During the meeting, nearly all of the SDRs expressed frustration with the policy and complained that it was unfair and burdensome compared to the treatment of other departments. Although Plaintiff had already been granted a medical accommodation permitting him to work remotely on a full-time basis, he attended the meeting in solidarity with his colleagues, advocating for broader work-from-home ("WFH") policies consistent with the expectations applied to other teams across the company. Plaintiff reasonably believed that his participation was protected activity in support of workplace fairness. Upon information and belief, Mr. Simerly, who was under pressure to demonstrate strict RTO enforcement to senior executives, including CEO Sajith Wickramasekara, viewed Plaintiff's solidarity and public alignment with the dissenting employees as a challenge to his authority and a source of personal frustration. Another SDR, Max Eddy, who also had a remote-work medical accommodation but chose not to attend the

meeting, was neither terminated nor disciplined and remains employed by Defendant. Plaintiff reasonably believes that his participation in the July 2022 meeting contributed to Defendant's retaliatory animus and ultimately factored into the decision to terminate his employment.

21. Following his return from medical leave, Plaintiff observed that he was no longer being afforded equal opportunities for success relative to other members of the Sales Development Representative (SDR) team. Unlike his peers, Plaintiff was excluded from attending in-person industry conferences—events which routinely generated high-value leads. Moreover, he was excluded from team-building and leadership opportunities, including interviewing candidates and planning team events, which were instead given to more junior, less experienced members of his team.

22. Plaintiff was also subjected to disruptive account changes during the middle of an active fiscal quarter, with several key accounts reassigned to other SDRs without explanation, undermining Plaintiff's sales momentum and opportunity pipeline.

23. Despite these impediments, Plaintiff's performance during the second fiscal quarter (May through July 2022) was exceptional. He achieved 100% of his individual and team sales targets and was responsible for generating the majority of the revenue bookings attributed to the Enterprise segment of the SDR team.

24. In August 2022, just weeks before Plaintiff's termination, Plaintiff's direct manager, Christian Haas-Kwon, encouraged him to begin preparing for a promotion expected to occur in or around December 2022, near Plaintiff's 18-month mark. Mr. Haas-Kwon emphasized Plaintiff's strong performance and advised him to explore any number of internal roles of interest, including those in sales or marketing. He provided Plaintiff with specific direction on

the promotion process and encouraged outreach to other teams—a directive Plaintiff acted upon by contacting colleagues and expressing interest in future openings.

25. On or about September 7, 2022, Plaintiff met with Emily Kirsch, Defendant's HR Generalist, and informed her that he would require another period of intermittent medical leave in the coming weeks. Ms. Kirsch acknowledged this request and guaranteed support, reiterating Defendant's accommodations and full commitment to supporting Plaintiff during his leave. She advised Plaintiff to share the details with his manager, Mr. Haas-Kwon, during their next routine meeting on September 15.

26. On September 15, 2022, only eight days later, Plaintiff attended what he was led to believe would be his routine weekly "one-on-one" meeting with Mr. Haas-Kwon, where he planned to disclose and discuss the medical leave, according to Ms. Kirsch's direction. He was surprised to find Maggie Lee, an HR representative, also in attendance. Within minutes and without prior notice, Plaintiff was summarily terminated from his employment. When Plaintiff asked for the reason, Mr. Haas-Kwon vaguely cited "performance" and then immediately exited the meeting. Ms. Lee then admitted she was unaware of any specific performance issues and stated unequivocally that she would follow up with more information. No such follow-up ever occurred.

27. Defendant never engaged in the legally required interactive process with Plaintiff regarding his September 7 accommodation and intermittent leave request, nor did it provide any reasonable accommodation prior to his termination. Instead, Defendant terminated Plaintiff just days after he invoked his rights under the ADA and FMLA.

28. Upon information and belief, none of the other seven Boston-based SDRs were terminated around that time, and at least one or more of them had not met their individual or

team targets for the second fiscal quarter, as well as other prior fiscal quarters. Plaintiff also understands that none of the other team members generated sales pipeline revenue performance comparable to his own.

29. Plaintiff was the most senior Boston SDR at the time of his termination, with more experience and responsibilities than his peers. At all times prior to and through his termination, Plaintiff was qualified for his position, performed his duties satisfactorily, and was never formally disciplined.

30. At no point did Plaintiff's disability pose any risk of harm to himself or others in the workplace, and he remained fully capable of performing the essential functions and tasks of his role, with or without reasonable accommodation.

31. Defendant regarded Plaintiff as having a disability, and Plaintiff had a documented history of serious and persistent health conditions that qualified as a protected disability under federal law.

32. In the months leading up to his termination, and throughout the second and third fiscal quarters, many, or possibly all, of Plaintiff's sales calls were recorded and stored by Defendant using its default SalesLoft phone-dialing configuration. These audio recordings, obtained without Plaintiff's consent or control, which Defendant used for internal performance monitoring and training, along with emails, presentations, and other materials, capture Plaintiff's competence, professionalism, and positive rapport with clients and colleagues, and are expected to serve as compelling evidence of his performance and character during discovery.

33. Plaintiff only recently discovered that Defendant's recording practices constituted unlawful interceptions under federal law. Plaintiff had no reasonable opportunity to discover the illegality earlier because Defendant concealed the nature of its recording practices, failed to

provide any notice or training, and never obtained Plaintiff's informed consent. Plaintiff reasonably relied on Defendant's representations and omissions regarding its call monitoring and recording practices and did not investigate their legality until recently, when he pieced together that these practices violated federal law.

34. Defendant's undisclosed recording practices violated both federal law, including the Federal Wiretap Act, 18 U.S.C. § 2511, and the Stored Communications Act, 18 U.S.C. §§ 2701–2707.

35. As a result of the above-described violations of federal law, Defendant is liable to Plaintiff for back pay, front pay, unpaid wages and commissions, compensatory and punitive damages, emotional distress damages, and all other remedies available under law.

36. Plaintiff timely filed a charge of discrimination with the EEOC alleging disability discrimination and retaliation arising out of the facts set forth herein. The EEOC issued a Notice of Right to Sue on July 30, 2025. Accordingly, Plaintiff has satisfied all administrative prerequisites under 42 U.S.C. § 12117(a) and 42 U.S.C. § 2000e-5(e, f).

## Count I - ADA Discrimination (42 U.S.C. § 12112)

37. Plaintiff repeats and incorporates by reference all preceding allegations as if fully set forth herein.

38. At all relevant times, Plaintiff was a qualified individual with a disability as defined by the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12102.

39. Plaintiff was capable of performing the essential functions of his position with or without reasonable accommodation.

40. Defendant Benchling, Inc. is an employer subject to the requirements of the ADA and had more than 15 employees during all relevant periods.

41. Defendant was aware of Plaintiff's disabilities and his need for accommodations, including continuous and intermittent medical leave and remote work flexibility.

42. Defendant failed to provide Plaintiff with reasonable accommodations, failed to engage in the interactive process in good faith, and ultimately terminated Plaintiff in whole or in part because of his actual or perceived disability.

43. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer economic damages, including lost wages, lost benefits, and loss of future earning capacity, as well as emotional distress and other non-economic harms.

44. Defendant's conduct was intentional, willful, and undertaken with reckless disregard for Plaintiff's rights under the ADA, entitling him to compensatory and punitive damages.

### Count II - ADA Retaliation (42 U.S.C. § 12203)

45. Plaintiff repeats and incorporates by reference all preceding allegations as if fully set forth herein.

46. Plaintiff engaged in protected activity under the ADA, including but not limited to: (a) requesting medical leave; (b) requesting reasonable accommodations, including remote-work flexibility; (c) asserting his rights under the statute; and (d) joining a July 2022 SDR team meeting in solidarity with colleagues to oppose Defendant's disparate and burdensome return-to-office policies, which Plaintiff reasonably believed were discriminatory and inconsistent with the equal rights of employees, including those requiring disability accommodations.

47. Plaintiff suffered an adverse employment action when Defendant terminated his employment on or about September 15, 2022—just days after he reiterated his need for intermittent leave and ongoing accommodation.

48. Upon information and belief, Defendant's management viewed Plaintiff's solidarity at the July 2022 meeting as disloyal and disruptive, and this event contributed to the retaliatory animus that culminated in Plaintiff's termination.

49. There is a direct causal connection between Plaintiff's protected activity and the adverse action taken by Defendant.

50. Defendant's conduct constitutes unlawful retaliation in violation of 42 U.S.C. § 12203.

51. As a direct and proximate result of Defendant's retaliatory actions, Plaintiff has suffered economic and non-economic damages, including but not limited to lost income, emotional distress, and diminished professional reputation.

52. Defendant's retaliatory conduct was intentional and carried out with malice or reckless indifference to Plaintiff's federally protected rights, entitling him to both compensatory and punitive damages.

### Count III - Interference with Rights Under The FMLA (29 U.S.C. § 2615(a)(1))

53. Plaintiff repeats and incorporates by reference all preceding allegations as if fully set forth herein.

54. At all relevant times, Plaintiff was an eligible employee under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq., and Defendant was a covered employer.

55. Plaintiff provided timely notice to Defendant of his serious health condition and need for protected medical leave under the FMLA. Plaintiff's leave was approved and taken from January to April 2022, and he later requested additional intermittent leave in September 2022.

56. Defendant interfered with Plaintiff's FMLA rights by failing to restore him to the same or an equivalent position upon his return from continuous leave and by delaying his ability to resume commission-generating work for two weeks after his reinstatement.

57. Defendant further interfered by failing to provide Plaintiff with a response to his September 7, 2022, request for intermittent leave and by terminating his employment before any accommodation could be implemented.

58. These acts constitute unlawful interference in violation of 29 U.S.C. § 2615(a)(1) and the regulations promulgated under 29 C.F.R. § 825.220.

59. As a direct and proximate result of Defendant's FMLA violations, Plaintiff has suffered financial harm, including loss of wages, benefits, and professional opportunities, and is entitled to damages as provided under 29 U.S.C. § 2617(a), including liquidated damages, interest, attorneys' fees, and costs.

### Count IV - Retaliation for Exercising FMLA Rights (29 U.S.C. § 2615(a)(2))

60. Plaintiff repeats and incorporates by reference all preceding allegations as if fully set forth herein.

61. Plaintiff engaged in protected activity under the FMLA by taking approved leave, applying for intermittent leave, and communicating his need for further accommodations related to his serious health condition. Plaintiff also engaged in protected concerted activity by joining a July 2022 SDR team meeting in solidarity with his colleagues to oppose Defendant's disparate and burdensome return-to-office policies, which Plaintiff reasonably believed were unfair, discriminatory, and inconsistent with employees' rights to equal treatment, including those needing medical leave or accommodations.

62. Shortly after Plaintiff informed Defendant on September 7, 2022, that he would require another period of intermittent leave, Defendant terminated his employment on September 15, 2022—only eight days later.

63. Upon information and belief, Defendant's management viewed Plaintiff's solidarity at the July 2022 meeting as disloyal and disruptive, and this animus combined with Plaintiff's exercise of FMLA rights to motivate the termination.

64. The temporal proximity, lack of prior discipline, and absence of any legitimate performance justification demonstrate a causal connection between Plaintiff's protected activity and his termination.

65. Defendant's termination of Plaintiff constitutes unlawful retaliation in violation of 29 U.S.C. § 2615(a)(2).

66. As a result of Defendant's retaliatory actions, Plaintiff has suffered lost wages, lost benefits, loss of career advancement opportunities, emotional distress, and reputational harm.

67. Pursuant to 29 U.S.C. § 2617(a), Plaintiff is entitled to all remedies available under the statute, including economic and liquidated damages, attorneys' fees, interest, and costs of litigation.

## Count V - Interception of Communications (Federal Wiretap Act, 18 U.S.C. §§ 2511, 2520)

68. Plaintiff repeats and incorporates by reference all preceding allegations as if fully set forth herein.

69. Defendant intentionally intercepted, disclosed, and/or used Plaintiff's wire communications, including telephone calls made through SalesLoft, without the consent of all parties to the communication.

70. Neither Plaintiff nor any other party to the communications consented to interception, and no statutory exception applies under 18 U.S.C. § 2511(2)(d).

71. These interceptions occurred in "all-party consent" jurisdictions, and were unlawful under federal law.

72. Defendant failed to provide written notice, never requested consent, and affirmatively misled Plaintiff as to the scope of its recording practices, thereby concealing the unlawful interceptions and preventing Plaintiff from discovering them earlier.

73. Plaintiff did not consent, expressly or impliedly, to Defendant's interception of his communications, nor were the other parties to the communications adequately notified.

74. Pursuant to 18 U.S.C. § 2520, Plaintiff has a private right of action to recover statutory damages, actual damages, punitive damages, reasonable attorneys' fees, and costs.

75. Plaintiff's claim is timely under 18 U.S.C. § 2520(e) because he only recently discovered that Defendant's conduct constituted unlawful interceptions, and he had no reasonable opportunity to discover the illegality earlier due to Defendant's concealment.

### Count VI - Unauthorized Access to Stored Communications (Stored Communications Act, 18 U.S.C. §§ 2701–2707)

76. Plaintiff repeats and incorporates by reference all preceding allegations as if fully set forth herein.

77. Defendant knowingly and intentionally accessed without authorization, or exceeded its authorized access to, stored electronic communications, including Plaintiff's call recordings and related metadata, which were maintained on SalesLoft servers and/or other third-party platforms.

78. The call recordings and related metadata were kept on systems providing an "electronic communication service" and/or "remote computing service" within the meaning of 18 U.S.C. §§ 2510(15), 2711(2), and were in "electronic storage" as defined in 18 U.S.C. § 2510(17).

79. Defendant used and disclosed these stored communications for internal monitoring, training, and performance management purposes without Plaintiff's informed consent.

80. Defendant failed to provide written notice of its recording and storage practices, never requested Plaintiff's consent, and affirmatively misled him as to the scope of such activities, which further demonstrates that Defendant knowingly exceeded any authorized access.

81. Defendant's conduct violated 18 U.S.C. § 2701 et seq., entitling Plaintiff to relief under 18 U.S.C. § 2707.

82. Plaintiff's claim is timely under 18 U.S.C. § 2707(f) because he only recently discovered that Defendant's conduct constituted unlawful access and storage of his communications, and he had no reasonable opportunity to discover the illegality earlier due to Defendant's concealment.

## Prayer for Relief

83. WHEREFORE, Plaintiff Julian Ross respectfully requests that This Court enter judgment in his favor and against Defendant Benchling, Inc., and grant the following relief:

84. Economic damages pursuant to the FMLA, 29 U.S.C. § 2617(a), including lost wages, salary, commissions, benefits, and interest, together with liquidated damages equal to that amount, and additional damages in lieu of reinstatement where appropriate;

85. Compensatory damages pursuant to the ADA, 42 U.S.C. § 12117(a), including damages for emotional distress, mental anguish, reputational harm, and loss of professional standing;

86. Punitive damages pursuant to the ADA, 42 U.S.C. § 1981a, based on Defendant's willful, malicious, and reckless disregard of Plaintiff's rights;

87. Statutory damages of at least $10,000 per violation, or $100 for each day of violation, whichever is greater, together with punitive damages, pursuant to the Federal Wiretap Act, 18 U.S.C. § 2520;

88. Statutory damages of at least $1,000 per violation, together with punitive damages, pursuant to the Stored Communications Act, 18 U.S.C. § 2707;

89. Injunctive relief, including but not limited to an order requiring Defendant to revise its employment policies and practices to comply with federal law;

90. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 2617(a)(3), 18 U.S.C. § 2520, and 18 U.S.C. § 2707;

91. Pre- and post-judgment interest on all amounts awarded, as provided by law; and

92. Such other and further relief as This Court deems just and proper.

### Request for Stay

Plaintiff notes that he has filed a related complaint in Massachusetts Superior Court asserting separate state-law causes of action arising from the same facts. Plaintiff respectfully intends to move this Court to stay proceedings in this case pending resolution of the Superior Court action, in the interest of judicial economy and to avoid duplicative litigation.

### Demand For Jury Trial

Plaintiff demands a trial by jury on all issues and all counts.

PLAINTIFF, PRO SE

*/s/ Julian Ross*

Julian Ross
105 East Street
Hadley, MA 01035
Telephone: 413-531-9810
E-mail: jross21@gmail.com