# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

JULIAN ROSS,

*Plaintiff*

v.

BENCHLING, INC.,

*Defendant*

CIVIL ACTION

Case No. 3:25-cv-30158-MGM

JURY TRIAL DEMANDED

## **COMPLAINT**

### **Table of Contents**

**Title**     **Page**

**INTRODUCTION**........................................................................................ 3

**JURISDICTION AND VENUE**...................................................................... 5

**PARTIES**.................................................................................................. 6

**ADMINISTRATIVE EXHAUSTION AND TIMELINESS**.................................... 7

**FACTUAL BACKGROUND**.......................................................................... 8

    A. Recruitment, Offer and Contract Formation................................................ 9

    B. Post-Agreement Bait-and-Switch and Invalid Arbitration Provision...................... 11

    C. Medical Leave, Disability Accommodation and Retaliation.................................. 14

    D. Strong Sales Performance Upon Return from Leave and Promotion Assurances 16

    E. Revenue Inflation, Enterprise Rules, and Plaintiff's Objections............................ 18

    F. Intermittent Leave, Termination, and HR Fabrication of Performance Pretext....... 19

    G. Post-Termination Coercion and Misuse of Equity to Obtain Release................... 21

    H. Unlawful Wiretapping of Telephone Calls Without Consent................................. 23

**COUNTS**................................................................................................. 24

**I - VII — FEDERAL ADA & FMLA**............................................................... 24

    COUNT I — DISABILITY DISCRIMINATION.................................................... 24

    COUNT II — FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS AND TO PROVIDE REASONABLE ACCOMMODATION...................................................... 26

    COUNT III — ADA 'REGARDED AS' DISABILITY DISCRIMINATION ADA......... 28

    COUNT IV — ADA RETALIATION.................................................................. 29

COUNT V — INTERFERENCE WITH RIGHTS UNDER THE FMLA...................................31
COUNT VI — FAILURE TO REINSTATE UNDER FMLA.......................................................33
COUNT VII — RETALIATION FOR EXERCISING RIGHTS UNDER THE FMLA................34
**VIII - XII — MASSACHUSETTS EMPLOYMENT AND LEAVE.............................................36**
COUNT VIII — DISABILITY DISCRIMINATION UNDER CH. 151B.................................36
COUNT IX — MASSACHUSETTS CH. 151B – FAILURE TO REINSTATE.........................37
COUNT X — PFMLA INTERFERENCE..................................................................................38
COUNT XI — PFMLA INTERMITTENT LEAVE INTERFERENCE......................................39
COUNT XII — MASSACHUSETTS PFMLA - RETALIATION.................................................41
**XIII - XVI — CALIFORNIA EMPLOYMENT & LEAVE.............................................................42**
COUNT XIII — DISABILITY DISCRIMINATION UNDER THE CALIFORNIA FEHA............42
COUNT XIV — FAILURE TO PROVIDE REASONABLE ACCOMMODATION AND FAILURE
TO ENGAGE IN THE INTERACTIVE PROCESS....................................................................44
COUNT XV — RETALIATION UNDER THE CALIFORNIA FEHA.........................................46
COUNT XVI — INTERFERENCE AND RETALIATION UNDER THE CALIFORNIA FAMILY
RIGHTS ACT...........................................................................................................................47
**XVII - XVIII — FEDERAL WHISTLEBLOWER STATUTES...................................................48**
COUNT XVII — RETALIATION UNDER THE SARBANES–OXLEY (SOX) ACT §806........48
COUNT XVIII — RETALIATION UNDER THE DODD–FRANK ACT §21F(h)......................53
**XIX - XXV — PRIVACY, SURVEILLANCE, AND  INTERCEPTION...........................................56**
COUNT XIX — FEDERAL WIRETAP ACT............................................................................57
COUNT XX — STORED COMMUNICATIONS ACT (SCA) – AUDIO RECORDINGS..........58
COUNT XXI — MASSACHUSETTS WIRETAP ACT - INTERCEPTION.............................60
COUNT XXII — MASSACHUSETTS RIGHT OF PRIVACY - INVASION.............................61
COUNT XXIII — CALIFORNIA INVASION OF PRIVACY ACT — INTERCEPTION............62
COUNT XXIV — CALIFORNIA INVASION OF PRIVACY — RECORDING.........................63
COUNT XXV — CALIFORNIA CONSTITUTIONAL PRIVACY..............................................64
**XXVI - XXVIII – CORPORATE FIDUCIARY AND SHAREHOLDER...........................................67**
COUNT XXVI — DIRECT SHAREHOLDER FIDUCIARY BREACH.....................................67
COUNT XXVII — DECLARATORY AND EQUITABLE RELIEF REGARDING
SHAREHOLDER RIGHTS AND FEDERAL FORUM SELECTION CLAUSE......................70
COUNT XXVIII — BREACH OF FIDUCIARY DUTY – CORPORATE GOVERNANCE
FAILURE................................................................................................................................72
**XXIX - XXX —  COMMON LAW.............................................................................................75**
COUNT XXIX — PROMISSORY ESTOPPEL.......................................................................75
RELIEF REGARDING ARBITRATABILITY............................................................................76
COUNT XXX — DECLARATORY JUDGMENT REGARDING ARBITRATION....................76
**PRAYER FOR RELIEF..........................................................................................................79**
**RESERVATION OF RIGHTS RE: ESI REMEDIES................................................................82**
**DEMAND FOR JURY TRIAL................................................................................................82**

## INTRODUCTION

1.      Plaintiff Julian Ross brings this action against Benchling, Inc., a Delaware corporation headquartered in California, for a coordinated sequence of unlawful acts spanning Federal, Massachusetts, and California employment law; Federal and state Privacy law; Federal Whistleblower-protection law; and core principles of Corporate Governance.

2.      Benchling discriminated against and terminated Plaintiff because of disability and protected medical-leave activity in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.; the Massachusetts antidiscrimination and paid-leave statutes ("PFMLA"), M.G.L. c. 151B and c. 175M; and the California Fair Employment and Housing Act ("FEHA") and California Family Rights Act ("CFRA").

3.      In parallel, Plaintiff raised internal objections to Benchling's revenue-inflation practices—including the mandated insertion of uniform, inflated enterprise values into sales-pipeline reporting—which he reasonably believed constituted violations of federal anti-fraud statutes and SEC-enforced financial-integrity rules. Plaintiff's protected whistleblowing activity is independently protected under the Sarbanes–Oxley Act §806, 18 U.S.C. § 1514A, and under the Dodd–Frank Act §21F(h), 15 U.S.C. § 78u-6(h). Benchling terminated Plaintiff only weeks after these disclosures, fabricated a post-hoc "performance" explanation, and subsequently deleted or failed to preserve the key 'Benchling Offer Illustrator' file, which is central to contract-formation evidence.

4.      Simultaneously, Benchling operated an undisclosed, default-on call-recording system that intercepted and stored employee and customer communications without consent, in violation of the Federal Wiretap Act (18 U.S.C. §§ 2511, 2520), the Stored Communications Act ("SCA"),

18 U.S.C. §§ 2701–2707, the Massachusetts Wiretap Act (M.G.L. c. 272 § 99), the

Massachusetts Privacy Act (M.G.L. c. 214 § 1B), and the California Invasion of Privacy Act

("CIPA"), Cal. Penal Code §§ 631, 632, and 632.7, as well as Article I, § 1 of the California

Constitution. These surveillance practices, configured and ratified by California-based

leadership, violated federal and state law and Benchling's contractual obligations to its software

vendors, generating substantial statutory exposure.

5.      Benchling's misconduct extended to serious corporate-governance failures. After Plaintiff

exercised his vested incentive stock options and became a shareholder, Benchling's officers

refused to provide the cap-table, attempted to condition shareholder rights on execution of a

general-liability release, and engaged in self-protective conduct designed to limit Plaintiff's

visibility into corporate operations. These acts constitute retaliation, bad-faith self-dealing, and

breach of fiduciary duties under Delaware and California law. Benchling further failed to

preserve key electronically stored information—most notably the "Benchling Offer Illustrator"

file whose deletion prejudices contract-formation and equity-valuation issues.

6.      Plaintiff seeks compensatory, liquidated, treble, and punitive damages; statutory wiretap

and SCA penalties; equitable and declaratory relief preserving shareholder rights and

controlling-law forum-selection provisions; and sanctions for Benchling's spoliation and

discovery misconduct.

7.      This action challenges not only the violation of Plaintiff's statutory rights as an

employee, whistleblower, and shareholder, but also the systemic, deliberate choices of a

venture-capital-funded technology enterprise that prioritized concealment, inflated financial

reporting, and institutional self-protection over statutory compliance, fiduciary duty, and lawful

corporate governance.

8.     Each Count in this Complaint is pleaded independently and incorporates only the

allegations necessary to state the specific statutory claim asserted. No Count relies on

impermissible global incorporation, and no duplicative factual assertions are alleged, satisfying

the pleading standards of Fed. R. Civ. P. 8(a) and 10(b).


## JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action

arises under the Constitution and laws of the United States, including but not limited to: the

Americans with Disabilities Act (42 U.S.C. § 12101 et seq.); the Family and Medical Leave Act

(29 U.S.C. § 2601 et seq.); the Sarbanes–Oxley Act § 806 (18 U.S.C. § 1514A); the Dodd–Frank

Act § 21F(h) (15 U.S.C. § 78u-6(h)); the Federal Wiretap Act (18 U.S.C. §§ 2511–2520); and the

Stored Communications Act (18 U.S.C. §§ 2701–2707).

10.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's

related state-law claims—including those arising under M.G.L. c. 151B, c. 175M, c. 272 § 99, c.

214 § 1B, the California FEHA, CFRA, CIPA, the California Constitution, and associated

fiduciary and tort claims—because they derive from the same nucleus of operative facts.

11.    Defendant Benchling, Inc. is subject to personal jurisdiction in Massachusetts because it

is registered to do business in the Commonwealth, employed Plaintiff in this District, and

directed the discriminatory, retaliatory, and surveillance conduct at issue toward Plaintiff while

he was located in Massachusetts. The interception of Plaintiff's telephone communications also

occurred in Massachusetts, invoking M.G.L. c. 272 § 99 and M.G.L. c. 214 § 1B.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of

the events and omissions giving rise to the claims occurred here, where Plaintiff lived, worked,

and suffered injury.

13.    Benchling's adverse employment decisions, surveillance directives, and termination approvals were made or ratified by California-based leadership, supporting both personal jurisdiction and the application of California employment, privacy, and governance statutes to conduct directed at an employee in Massachusetts. These California-originating decisions form part of the same integrated factual matrix underlying all claims.

## PARTIES

14.    Plaintiff Julian Ross is a natural person living in Hampshire County, Massachusetts. From June 21, 2021 through September 15, 2022, he was employed by Benchling, Inc. and performed all work within the Commonwealth, including in Benchling's Boston office. Plaintiff exercised and holds vested incentive stock options, giving him an ongoing shareholder interest in Benchling, Inc. and corresponding rights under Delaware and California corporate law. During his employment, Plaintiff was physically located in Massachusetts during numerous telephone communications that were unlawfully intercepted.

15.    Defendant Benchling, Inc. is a Delaware corporation with its principal place of business at 680 Folsom Street, 8th Floor, San Francisco, California. Benchling is registered to do business in Massachusetts, maintains continuous commercial contacts within the Commonwealth, and employed Plaintiff in this District. Benchling is an "employer" under the ADA, 42 U.S.C. § 12111(5), and a "covered employer" under the FMLA, 29 U.S.C. § 2611(4). The discriminatory, retaliatory, and surveillance-related practices challenged in this action were directed at Massachusetts and materially injured Plaintiff within the Commonwealth.

16.    Agency and Corporate Responsibility. At all relevant times, Benchling's managers, officers, human resources personnel, and agents—including CEO Sajith ("Saji") Wickramasekara, Director of Sales Development Sean Simerly, Sales Development Manager ("SDR Manager") Christian Haas-Kwon, HR Generalist Emily Kirsch, and HR Director Maggie Lee—acted within the scope of their employment and authority, and their conduct is attributable to Benchling under principles of respondeat superior, agency, and ratification.

## ADMINISTRATIVE EXHAUSTION AND TIMELINESS

17.    Plaintiff satisfied all administrative prerequisites to suit under the ADA, 42 U.S.C. § 12117(a), and 42 U.S.C. § 2000e-5. On May 10, 2023, Plaintiff filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD"), which was automatically dual-filed with the EEOC pursuant to the agencies' work-sharing agreement. The Charge alleged disability discrimination, failure to accommodate, interference with protected medical-leave rights, and retaliation. The EEOC issued a Notice of Right to Sue on July 30, 2025. Plaintiff commenced this action within ninety days, rendering all ADA, FMLA, PFMLA, FEHA, and CFRA claims timely.

18.    Plaintiff also satisfied the filing prerequisite for his Sarbanes–Oxley Act § 806 claim. On November 16, 2025, Plaintiff submitted a whistleblower complaint to the Occupational Safety and Health Administration ("OSHA") pursuant to 18 U.S.C. § 1514A(b)(1)(A). OSHA's subsequent administrative closure does not constitute a "final decision" on the merits and does not bar de novo review in this Court. Timeliness and exhaustion for the SOX claim are therefore satisfied.

19.     Plaintiff's claims under Massachusetts law—including M.G.L. c. 151B, c. 175M, c. 272 §

99, and c. 214 § 1B—are likewise timely under their respective statutes of limitations and require

no additional administrative proceedings. California FEHA and CFRA claims are timely under

Cal. Gov. Code §§ 12960 and 12965.  All claims under Massachusetts General Laws c. 151B are

fully exhausted. MCAD retained the charge for more than six months without issuing a

dismissal, rendering Plaintiff entitled to commence suit in court under M.G.L. c. 151B § 9. The

EEOC's issuance of a Right-to-Sue Notice further satisfies all federal exhaustion requirements.

PFMLA claims do not require MCAD exhaustion; Plaintiff alleges them independently under the

statute.


## FACTUAL BACKGROUND

20.     Plaintiff Julian Ross began employment with Benchling on June 21, 2021 in the full-time

position of Sales Development Representative ("SDR"), serving major enterprise accounts in the

biotechnology and pharmaceutical sectors across the United States and Europe. Benchling is a

cloud-based software company that develops and licenses research-and-development informatics

platforms used by leading biotechnology and pharmaceutical organizations to design, document,

and analyze scientific data.

21.     During his employment, Plaintiff performed all work within the Commonwealth of

Massachusetts. Plaintiff's role involved extensive telephone, video, and electronic

communication with customers, prospects, and internal sales teams, and all essential job

functions could be and routinely were performed remotely.

22.     Benchling classified Plaintiff as a non-exempt employee with an hourly base wage of

$31.25. In addition to base compensation, Plaintiff was eligible for variable commissions and

quarterly bonuses, with an annual target incentive of $30,000. As part of the compensation package, Benchling granted Plaintiff incentive stock options ("ISOs") under its employee equity plan, conferring vested ownership rights upon exercise and creating an ongoing shareholder interest in the company. Plaintiff also received standard employee benefits, including health insurance, paid time off ("PTO"), and participation in Benchling's retirement and equity programs.

23.     Benchling's recruiters and management represented the SDR position as a significant career-growth opportunity within a rapidly expanding technology enterprise approaching an anticipated public offering. In reliance on these representations, Plaintiff left stable prior employment, accepted Benchling's offer, and undertook relocation and financial commitments to begin work.

## A. Recruitment, Offer and Contract Formation

24.     On March 30, 2021 at 7:14 p.m. Eastern Time, Benchling SDR Manager Christian Haas-Kwon contacted Plaintiff through LinkedIn to recruit him for "building a senior SDR team in Boston." In that initial outreach and subsequent communications, Mr. Haas-Kwon stated that Plaintiff's experience and skills made him an ideal candidate, explaining that Benchling was "doubling this year," seeking individuals with SDR experience and scientific training, and offering significant vertical and lateral mobility within a rapidly scaling, pre-IPO technology company. Through the interview process, Mr. Haas-Kwon represented that Benchling offered long-term career growth, "awesome perks," wellness stipends, and a defined and timely framework for internal promotion track from the SDR position. Plaintiff reasonably relied on

these representations in entering the recruitment process and declining other professional opportunities.

25.     After multiple interviews and completion of a comprehensive take-home assignment, Plaintiff received, negotiated, and accepted a final offer during a telephone call with Mr. Haas-Kwon on April 28, 2021 at approximately 2:30 p.m. Eastern Time. During that call, the parties reached mutual assent on all material terms of employment, including expectations, salary, commission structure, benefits, job title, start date, and equity participation. The only remaining administrative item was Plaintiff's request for a modest (around 10%) increase in incentive stock options ("ISOs"). Mr. Haas-Kwon stated that this increase was reasonable, would be clerically approved by Benchling leadership, and did not otherwise affect the offer or parties' formed agreement. Plaintiff accepted the offer on that call, relying on Haas-Kwon's representation that CEO approval was a ministerial step rather than a condition precedent to contract formation. A binding employment contract was therefore mutually assented-to and formed on April 28, 2021, supported by consideration and complete agreement on all material terms.

26.     On May 10, 2021—*after the parties had already reached agreement*—SDR Manager Christian Haas-Kwon telephoned Plaintiff to confirm the increased ISO grant and a June 21 start date. During this call, Mr. Haas-Kwon shared a Google Sheets file titled "Benchling Offer Illustrator" from Benchling's corporate 'Google Workspace'. The spreadsheet memorialized the terms previously agreed on April 28 and was jointly reviewed and edited in real-time to finalize compensation and equity, including the increased ISO allocation that Mr. Haas-Kwon stated had been approved by Benchling leadership and the Board. Plaintiff accepted these finalized terms

and relied on them in immediately resigning from prior employment, making new living arrangements, and preparing for his June 21 start.

27.     The "Benchling Offer Illustrator" was the central and exclusive written document capturing the parties' agreement. It contained only compensation, equity, and expectations information; no arbitration, waiver, or dispute-resolution terms appeared anywhere in it, and none were discussed at any stage of negotiation. Mr. Haas-Kwon described the file as Plaintiff's personalized offer document and assured him it would remain accessible.

28.     Following this final agreement, Benchling's recruiting coordinator, Chanel Cristobal, emailed Plaintiff at 6:04 p.m. ET on May 10 to congratulate him on accepting the offer and to confirm that a DocuSign onboarding packet would follow for administrative processing.

## B. Post-Agreement Bait-and-Switch and Invalid Arbitration Provision

29.     On May 12, 2021 at 12:45 p.m. Eastern Time—two full weeks after the parties had reached final agreement on all material terms (April 28) and two days after the "Benchling Offer Illustrator" file ratified the agreement (May 10)—Benchling transmitted a standardized DocuSign onboarding bundle for administrative processing. The bundle was required for Plaintiff to access Benchling's payroll, benefits, and HR systems and contained no stand-alone arbitration agreement, no cover page identifying arbitration terms, and no opt-out provision. Instead, a single arbitration paragraph was embedded mid-packet, surrounded by routine HR and onboarding acknowledgments, and could seemingly not be bypassed. The DocuSign platform required Plaintiff to initial or sign each page sequentially as a unified document in order to complete onboarding. The arbitration section was transmitted as part of a single, indivisible

document workflow rather than as a stand-alone agreement, further demonstrating the absence of meaningful choice, informed assent, or any bilateral negotiation over dispute-resolution terms.

30.    Plaintiff executed the DocuSign packet solely as an administrative prerequisite to commence employment and gain access to the rest of the HR and Payroll systems, and because the system offered no alternative path—not as assent to any new or superseding contractual terms beyond the agreement mutually assented to on April 28. No Benchling manager, recruiter, or HR representative disclosed that arbitration was optional, that employment could begin without agreeing to arbitration, or any information regarding JAMS Employment Arbitration Rules, fees or delegation. Benchling provided no separate presentation of the arbitration clause, did not highlight or isolate it, required no separate signature, and did not furnish the applicable arbitral rules. No Benchling personnel referenced or explained the arbitration provision at any point prior to litigation, and the company first invoked it only through counsel after Plaintiff sought judicial relief.

31.    By May 12 when the DocuSign forms were sent, Plaintiff had already accepted the offer, resigned his prior employment, made new living arrangements, and committed to a June 21 start date.

32.    Benchling later produced extracted, stand-alone pages containing the arbitration language, stripped of the surrounding packet. This presentation concealed material context and further confirms that the clause was embedded inconspicuously within a mandatory, non-negotiable onboarding bundle rather than presented as a bargained-for contractual term.

33.    The "Benchling Offer Illustrator"—the contemporaneous written memorialization of the parties' negotiations and final agreement—remained accessible to Plaintiff through the original Google Workspace link throughout his employment. In October 2025, while preparing for

litigation, Plaintiff discovered that Google Workspace now designates the file as "deleted."
Because the file was central to contract formation and reflected all material terms excluding
arbitration, its deletion after the triggering of Benchling's duty to preserve ESI directly
implicates Fed. R. Civ. P. 37(e).

34.    Plaintiff never received a stand-alone arbitration agreement; never received a
conspicuous disclosure or summary of rights; never received the governing JAMS rules; and was
offered no opt-out window. In order to simply obtain access to the HR and Payroll systems
necessary for work, he was required to click through each part of the DocuSign packet.

35.    Benchling did not present arbitration terms as a separate, negotiable agreement, and it did
not provide any opt-out, rules, or explanation. Plaintiff understood the DocuSign packet as a
coercive, non-negotiable administrative requirement to activate employment already agreed on
April 28, 2021.

36.    At no point did Benchling disclose, verbally or in writing, that arbitration was optional,
waivable, or separable from the administrative onboarding sequence. The DocuSign platform
presented the packet as a unified, mandatory workflow required to activate Plaintiff's
employment credentials, and provided no mechanism—technical or administrative—to proceed
without initialing the embedded arbitration paragraph. There was no alternative path to complete
onboarding, obtain payroll access, enroll in benefits, or begin work. No JAMS rules were
provided, no opt-out period was offered, and no separate document or acknowledgment
identified arbitration terms as a bargained-for condition of employment. Benchling never stated
that continued employment was contingent on acquiescing to arbitration, and no fresh
consideration was provided for any purported post-formation obligation.

## C. Medical Leave, Disability Accommodation and Retaliation

37.     In January 2022, Plaintiff notified Benchling that he required medical leave due to serious health conditions. Plaintiff was fully eligible for job-protected leave under both the Massachusetts Paid Family and Medical Leave Act ("PFMLA"), M.G.L. c. 175M, the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and his conditions constituted disabilities under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102. Benchling had explicit notice of Plaintiff's diagnoses and ongoing medical limitations. Plaintiff had received no warnings, discipline, or negative performance feedback before requesting leave.

38.     On February 6, 2022, Plaintiff's licensed health care provider submitted a formal "Certification of Your Serious Health Condition" confirming the need for continuous medical leave from January 24 through April 18, 2022. Benchling approved the leave.

39.     Plaintiff returned on April 18, 2022 with full medical clearance. However, despite ample notice and prior confirmation of his return date, Benchling immediately restricted his access to accounts and barred him from performing essential sales duties, earning commissions, or resuming normal operations until May 1, 2022—the start of the next fiscal quarter. Plaintiff essentially sat on his hands for two weeks while waiting for accounts to be assigned. Management offered no operational justification, stating only that "it doesn't make sense" to reinstate him before May 1.

40.     During this period, the Sales Development Representative ("SDR") group—under the authority of Director of Sales Development Sean Simerly—was subjected to a uniquely strict RTO (Return-to-Office) mandate (following the COVID-19 Pandemic) of four to five days per week, materially harsher than the policy applied company-wide and to other teams. Plaintiff's

medically approved fully-remote status rendered him conspicuous and a target within the SDR organization.

41.    In July 2022, Mr. Simerly convened a cross-office SDR Zoom meeting with participants from Boston, San Francisco, and Zurich to address widespread frustration over the RTO directive and perceived unfairness. Nearly every SDR expressed that the policy was inequitable and inconsistent with Benchling's broader practices. Plaintiff—whose remote accommodation remained approved—participated in support of his colleagues and advocated for consistent, equitable work-from-home flexibility. Plaintiff reasonably believed such participation constituted protected opposition under Section 7 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 157, as well as protected activity under the ADA, CFRA, and FMLA.

42.    Upon information and belief, Mr. Simerly—who faced executive pressure from CEO Sajith ("Saji") Wickramasekara to enforce RTO compliance—viewed Plaintiff's participation and alignment with dissenting employees as insubordination. The same managers enforcing RTO mandates were the same individuals who later participated in or ratified Plaintiff's termination.

43.    Following Plaintiff's protected leave, accommodation requests, and protected concerted activity, Benchling's treatment of him shifted sharply. Plaintiff experienced escalating disparate treatment, including:

   a.   exclusion from industry conferences to which similarly situated SDRs with less experience were invited;

   b.   removal from internal team-building, interview, and leadership activities he previously performed;

   c.   reassignment of several key sales accounts mid-quarter without explanation, undermining commissions and pipeline development; and

     d.   persistent marginalization from Account Executives who had previously relied on his work.

44.    Despite this treatment, Plaintiff's performance in FY23Q2 (May 1–July 31, 2022) was exceptional. He achieved 100% of quota, met all performance metrics, and generated the majority of Enterprise pipeline revenue. His manager, Christian Haas-Kwon, repeatedly praised him as "outstanding."

45.    Benchling nevertheless continued to view Plaintiff as a burden due to his medical needs, his approved remote-work accommodation, and his willingness to support colleagues critical of the RTO mandate.

46.    Benchling did not propose any alternative accommodations or discuss Plaintiff's intermittent leave request further. Plaintiff is aware of no other SDR in the Boston office who was terminated during this period, including SDRs who did not meet quarterly performance benchmarks. Plaintiff's diagnoses were medically managed, and his performance metrics and internal feedback remained strong through his termination.

## D. Strong Sales Performance Upon Return from Leave and Promotion Assurances

47.    For the second fiscal quarter of 2023 (May 1–July 31, 2022), Plaintiff achieved 100% of quota, ranked among the top performers on the Enterprise Sales Development Representative ("SDR") team, and led the team in total Annual Recurring Revenue ("ARR") pipeline generation. Internal dashboards reflected that Plaintiff generated a hugely disproportionate share of Enterprise pipeline value and contributed materially to the company's Q2 performance metrics.

48.     These results are especially notable given that Plaintiff had been excluded from conferences, had key accounts reassigned mid-quarter, and had been denied several lead-generating opportunities afforded to less-experienced SDRs. Despite these obstacles, Plaintiff's performance remained objectively exceptional. He had received no warnings, disciplinary actions, or negative performance indicators at any point—before or after his medical leave.

49.     Throughout July and August 2022, Plaintiff's direct manager, Christian Haas-Kwon—who was fully aware of Plaintiff's medical leave, accommodation status, and ongoing protected activity—repeatedly praised Plaintiff's performance. Mr. Haas-Kwon told Plaintiff explicitly that he was on track for promotion into a closing role or other appropriate position, expected around December 2022. During a one-on-one meeting in mid-August 2022, Mr. Haas-Kwon instructed Plaintiff to begin preparing for promotion by networking internally, exploring open roles across sales and marketing, and positioning himself for advancement. He emphasized that Plaintiff was a strong internal candidate based on merit, tenure, and performance. These statements were clear, unequivocal, and made within the scope of Haas-Kwon's managerial authority. Benchling knew or reasonably should have known that Plaintiff would rely on them in shaping his employment decisions.

50.     Plaintiff followed this guidance, reviewed internal job postings, reached out to prospective teams, and began preparation for internal mobility consistent with Benchling's career-development framework and Haas-Kwon's assurances. His performance metrics, account activity, call recordings, and contemporaneous feedback from Account Executives corroborated his continued excellence. Plaintiff's Account Executive partners and SDR peers specifically commended him for generating the majority of Enterprise pipeline during the quarter.

51.     These promotion assurances, coupled with unbroken positive feedback, created a reasonable expectation that Plaintiff would be promoted or, at minimum, seriously considered for advancement. Yet less than a month later—and only weeks after receiving this praise—Benchling abruptly terminated him without any prior discipline, coaching, PIP, documented concern, or formal review.

52.     At all relevant times, Plaintiff was a qualified individual performing at or above expectations. Benchling's decision to terminate him shortly after affirming his candidacy for promotion cannot be reconciled with his objective performance.

## E. Revenue Inflation, Enterprise Rules, and Plaintiff's Objections

53.     Benchling's Enterprise Sales Rules Document required Sales Development Representatives in the Enterprise/Global segment to assign a standardized *$250,000* estimated deal value to all enterprise opportunities, regardless of known facts, discovery-call notes, or any reasonable assessment of the prospect's likely contract value. In practice, enterprise opportunities rarely approached this figure at close; most fell substantially below it. This uniform booking rule materially inflated pipeline value, distorted internal performance metrics, and created an inaccurate representation of sales activity across the segment. Benchling's valuation models, board decks, and investor-facing narratives relied on these metrics as proxies for enterprise demand and pipeline health.

54.     Plaintiff raised specific concerns about the accuracy, integrity, and financial legitimacy of this practice to his manager, Mr. Christian Haas-Kwon. Plaintiff informed Mr. Haas-Kwon that the mandated $250,000 assignment bore no relation to real-world ACV expectations as reflected in Plaintiff's direct communications with prospective customers, his discovery-call notes, and his

experience with comparable enterprise accounts. Plaintiff explained that the rule lacked any coherent economic justification and produced misleading sales data. Plaintiff expressly stated that he was uncomfortable entering values he believed to be artificially inflated.

55.     Rather than investigate, escalate, or address these concerns, Mr. Haas-Kwon instructed Plaintiff to simply "follow the rules" and input whatever figure the supervising Account Executive directed—typically the full $250,000—despite Plaintiff's objections. Plaintiff complied under managerial direction. These inflated values were then incorporated into Benchling's internal reporting systems, including Salesforce, where they materially increased Plaintiff's attributed pipeline, performance analytics, and qualitative assessments. In the weeks following the close of the fiscal quarter ending July 31, management expressly praised Plaintiff for the "impact" reflected in these metrics, even as Plaintiff continued to question the legitimacy of the underlying figures.

56.     Only weeks after commending Plaintiff for his contributions, the company invoked "performance issues" as a termination rationale—relying on the same inflated metrics it had mandated and enforced.

## F. Intermittent Leave, Termination, and HR Fabrication of Performance Pretext

57.     On September 7, 2022, Plaintiff notified HR Generalist Emily Kirsch that his treating physician had prescribed intermittent medical leave to manage ongoing symptoms of his disability. Plaintiff was fully eligible for such leave under the PFMLA, FMLA, and ADA. Ms. Kirsch acknowledged the request, affirmed that accommodation would continue, and instructed Plaintiff to coordinate logistics with his manager, Christian Haas-Kwon, during their next one-on-one.

58.     On September 15, 2022—only eight days after Plaintiff's protected disclosure—Plaintiff joined what he understood to be a routine scheduling check-in. Instead, Sales Manager Haas-Kwon and HR Director Maggie Lee appeared on the call. Without prior warning, discipline, or documented performance issue of any kind, Haas-Kwon abruptly announced that Plaintiff was being terminated "for performance." No examples or explanations were provided. Haas-Kwon immediately exited the call, leaving Ms. Lee, who admitted she lacked details, to conclude the meeting. No written or oral clarification ever followed.

59.     That same afternoon, Ms. Kirsch emailed to formalize the termination and attached a Separation Agreement conditioning supposed post-employment benefits on Plaintiff's execution of a broad release of claims. This was the first written reference to any alleged "performance issues," notwithstanding Plaintiff's established performance record, recent promotion discussions, and absence of any coaching, warnings, or PIPs.

60.     Between September 15 and September 23, HR continued active engagement focused primarily on securing a release. On September 23, Plaintiff wrote to Ms. Kirsch expressing concern regarding the suspicious timing of the termination relative to his September 7 medical-leave disclosure. Later that evening, Ms. Kirsch—writing "on behalf of leaders at Benchling"—asserted that there had been "ongoing discussions about your performance for months." This statement was false. No emails, Slack messages, HR notes, coaching documents, performance dashboards, or supervisory communications support the existence of any such discussions, and none were ever communicated to Plaintiff during his employment. The narrative surfaced only after Plaintiff linked the termination to protected medical-leave activity.

61.     In the ensuing days, HR escalated pressure to obtain a release. Benchling repeatedly revised and re-issued the Separation Agreement, imposed arbitrary signature deadlines, and

falsely claimed on October 5, 2022 that Plaintiff's vested incentive stock options ("ISOs") would be "disqualified" unless he signed. When Plaintiff requested the actual legal exercise deadline, Ms. Kirsch conceded that Plaintiff retained the standard post-termination exercise window regardless of whether he executed a release, confirming that the earlier "disqualification" threat was baseless.

62.     By September 23, 2022, when Plaintiff provided written notice disputing the stated rationale and identifying the connection between his disability, protected leave, and termination, litigation was objectively foreseeable. Benchling was therefore obligated to preserve all relevant evidence, including Slack communications, HR notes, activity metrics, call data, and the "Benchling Offer Illustrator" central to contract-formation issues. On November 22, 2022, Plaintiff's then-counsel served a formal litigation-hold notice on Benchling's CEO and General Counsel. Despite this, the "Benchling Offer Illustrator" was later discovered to have been deleted from Benchling's Google Workspace environment.

63.     Plaintiff timely exercised his vested ISOs in December 2022 and became a shareholder. Benchling nevertheless continued to condition supposed equity-related "eligibility" on signing a release, further attempting to leverage corporate instruments to suppress anticipated statutory claims.

## G. Post-Termination Coercion and Misuse of Equity to Obtain Release

64.     Immediately following Plaintiff's September 15, 2022 termination, Benchling's HR and Legal departments initiated an aggressive and misleading campaign to secure a sweeping general release of all federal, state, and common-law claims. Within hours, HR transmitted a Separation Agreement that conditioned purported post-employment benefits—compensation timing,

COBRA assistance, and administrative accommodations—on Plaintiff's execution of a broad waiver of rights. This campaign began while Plaintiff was actively disputing the legitimacy of his termination and before Benchling had provided any explanation for the asserted "performance" rationale.

65.    Between September 28 and October 11, 2022, HR repeatedly reissued modified versions of the Separation Agreement, imposed arbitrary signature deadlines, then unilaterally extended those deadlines after they expired. During this period, HR escalated pressure by falsely asserting that Plaintiff's vested incentive stock options ("ISOs") would be "disqualified" unless he signed the release. Benchling knew this statement was untrue. Plaintiff's vested ISOs were governed solely by the Company's Board-approved 2013 Stock Plan and Option Agreement, neither of which conditioned exercise rights on execution of a severance waiver. When Plaintiff requested the actual legal exercise deadline, HR admitted he retained the standard post-termination exercise window regardless of whether he signed—confirming the "disqualification" threat was a coercive tactic rather than a lawful administrative notice.

66.    In December 2022, Plaintiff exercised 1,750 vested ISOs, paying approximately $11,970 and thereby becoming a shareholder of Benchling, Inc. Upon exercise, Plaintiff acquired enforceable shareholder rights under California law, including timely issuance of shares, Rule 701(e) financial disclosures, non-retaliatory administration of transfer restrictions, and access to the Company's capitalization table. Benchling immediately obstructed these rights. Plaintiff requested Benchling's Capitalization Table through Carta—the Company's equity-management platform—but Benchling denied the request and listed Plaintiff's cap-table access as "RESTRICTED," preventing Plaintiff from viewing his own issuance data, dilution, valuation, or governance documents. Benchling withheld required financial disclosures, failed to provide

notices of issuance, and ignored Plaintiff's repeated requests for shareholder materials. These denials lacked any legitimate corporate purpose and continued the same pressure tactics that characterized the severance-release campaign.

67.    Benchling's obstruction of shareholder information overlapped with its failure to preserve critical electronically stored information. As Plaintiff later discovered, the "Benchling Offer Illustrator"—the pre-DocuSign, contemporaneous contract-formation file—had been deleted from Benchling's Google Workspace despite the foreseeability of litigation and despite Plaintiff's former counsel issuing a formal litigation-hold notice on November 22, 2022.

## H. Unlawful Wiretapping of Telephone Calls Without Consent

68.    Beginning no later than FY23 Q2 and continuing through Plaintiff's termination, Benchling configured its 'Salesloft' dialer and analytics platform to automatically record all SDR telephone calls by default, including calls between Plaintiff and customers, prospects, Account Executives, and supervisors. Plaintiff's calls were recorded while he was physically located in Massachusetts, and many calls originated from or terminated within the Commonwealth. At no time did Plaintiff—or any party to the calls—provide consent.

69.    No statutory notice was ever given. There was no audible beep tone, no pre-call banner, no system warning, and no written policy acknowledgment disclosing that calls would be recorded. SDRs could not view, modify, or disable the recording setting. The recording occurred secretly, automatically, and continuously.

70.    Benchling also knowingly accessed and retrieved stored communications within the meaning of the Stored Communications Act, 18 U.S.C. §§ 2701–2707, because Salesloft's Master Subscription Agreement and acceptable-use terms expressly condition any access to

content on compliance with applicable law. Benchling's unauthorized retention, retrieval, and use of recordings made in violation of state and federal statutes exceeds any permissible authorization and constitutes unlawful access under the SCA.

71.    Upon information and belief, Benchling's leadership—including Director of Sales Development Sean Simerly—maintained the system in continuous, automated-capture mode with full awareness of the legal risks. Mr. Simerly's extensive professional background in audio engineering and recording underscores that he understood, or recklessly disregarded, the statutory consent requirements governing audio capture in the jurisdictions where Benchling operated, including Massachusetts and California. Benchling's senior management accessed, reviewed, and used these recordings for performance evaluation and managerial oversight, further compounding the unlawful interception.

72.    The system simultaneously recorded calls of other sales personnel, many of whom conducted business involving Massachusetts clients or colleagues.

## COUNTS

## I - VII — FEDERAL ADA & FMLA

## COUNT I — DISABILITY DISCRIMINATION

### (ADA, 42 U.S.C. § 12112(a))

73.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

74.    Plaintiff is a "qualified individual with a disability" under 42 U.S.C. § 12102(1). He has been diagnosed with depressive and anxiety disorders and severe insomnia—impairments that

substantially limit major life activities—and at all relevant times could perform the essential functions of the SDR role with or without reasonable accommodation.

75.    Defendant is an ADA-covered employer. Benchling had actual knowledge of Plaintiff's disabilities no later than January 2022, when he notified management and HR, supported by provider certification, of the need for continuous medical leave from January 24 to April 18, 2022, and later intermittent leave.

76.    Although medically cleared to return on April 18, 2022, Benchling barred Plaintiff from core duties, commissions, and account work until May 1, 2022—without legitimate business justification—resulting in lost earnings and constituting an adverse action taken because of disability and recent protected leave.

77.    Upon reinstatement, Benchling subjected Plaintiff to materially less favorable treatment than similarly situated peers, including: (a) exclusion from in-person industry events generating high-value pipeline; (b) mid-quarter reassignment of accounts without explanation; and (c) omission from leadership and team-building activities for which he was fully qualified.

78.    Despite these constraints, Plaintiff achieved 100% of quota for FY23 Q2 (May 1–July 31, 2022), led the Enterprise SDR segment in pipeline generation and ARR impact, and received repeated promotion assurances for December 2022.

79.    On September 7, 2022, Plaintiff notified HR of his physician-prescribed need for intermittent leave. Eight days later, on September 15, 2022—without discipline, performance documentation, or any contemporaneous concerns—Benchling terminated him, offering only a vague "performance" rationale.

80.    That explanation is implausible and pretextual given Plaintiff's superior Q2 results, recent promotion assurances, the complete absence of documented deficiencies, and the tight

temporal proximity between protected medical disclosures and adverse actions. HR later fabricated "months" of warnings that never occurred.

81.    Benchling also "regarded" Plaintiff as disabled, 42 U.S.C. § 12102(3), by treating him as impaired or unreliable due to his mental-health conditions and anticipated need for intermittent leave, as reflected in the unjustified reinstatement restrictions, reduced opportunities, and abrupt discharge following renewed leave notice.

82.    Benchling's conduct constitutes discrimination "because of" disability in violation of 42 U.S.C. § 12112(a), including adverse treatment in the terms and conditions of employment and termination on a prohibited basis. To the extent Benchling refused reasonable accommodations—such as immediate reinstatement to full duties and non-penalization for medically necessary scheduling flexibility—such refusal independently violates 42 U.S.C. § 12112(b)(5)(A).

83.    As a direct and proximate result, Plaintiff suffered lost wages and benefits, loss of career advancement, reputational harm, and significant emotional distress. Defendant acted intentionally or with reckless indifference to Plaintiff's federally protected rights, entitling him to compensatory and punitive damages, attorneys' fees, costs, and other appropriate relief.


## COUNT II — FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS AND TO PROVIDE REASONABLE ACCOMMODATION

### (ADA, 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.2(o))

84.    Plaintiff realleges and incorporates all preceding paragraphs.

85.    Plaintiff is a qualified individual with a disability under 42 U.S.C. § 12102(1). His diagnosed depressive and anxiety disorders and severe insomnia substantially limit major life

activities, including sleep, and he could perform the essential functions of the SDR role with or without reasonable accommodation.

86.    Benchling had actual knowledge of Plaintiff's disabilities. In January 2022, Plaintiff provided HR with medical certification supporting continuous leave from January 24 to April 18, 2022, and he discussed his disability and accommodation needs with his manager, Christian Haas-Kwon, upon returning from leave. HR personnel—including Emily Kirsch and Maggie Lee—processed the documentation and maintained ongoing communication, establishing clear notice.

87.    Although medically cleared to resume full duties on April 18, 2022, Benchling barred Plaintiff from account work and commission-earning activities until May 1, 2022—without medical, operational, or business justification—resulting in lost earnings and violating the obligation to reinstate him to the same or equivalent position.

88.    In May 2022, Plaintiff requested intermittent leave and continued remote-work flexibility, supported by physician documentation and fully consistent with Benchling's remote-capable SDR infrastructure. While nominally permitting remote work, Benchling immediately began restricting his opportunities, reassigning accounts, and reducing his internal visibility.

89.    In July 2022, Plaintiff participated in a cross-office meeting where SDRs raised concerns about the inequitable return-to-office mandate. Plaintiff's comments—asserting that his medical accommodation must be honored—constituted protected activity and a reaffirmation of his need for accommodation.

90.    Rather than engage in the required interactive process, management treated Plaintiff's accommodation needs as burdensome: supervisors became distant, excluded him from

developmental opportunities, and reassigned multiple active enterprise accounts without explanation.

91.    On September 7, 2022, Plaintiff notified HR of his physician-directed need for intermittent leave over the upcoming weeks. HR Generalist Emily Kirsch acknowledged approval and instructed him to coordinate logistics with his manager. Plaintiff did so. Eight days later, on September 15, 2022, during what he believed was a routine meeting to finalize that leave, Benchling summarily terminated his employment without prior discipline, documentation, or discussion.

92.    Benchling never engaged in the interactive process required by 29 C.F.R. § 1630.2(o)(3). No discussion occurred regarding scheduling flexibility, workload adjustment, or any feasible alternative. The company simply ended Plaintiff's employment immediately after a documented accommodation request, thereby denying him intermittent leave and violating 42 U.S.C. § 12112(b)(5)(A).

93.    As a direct and proximate result, Plaintiff suffered lost wages and benefits, lost career advancement, reputational harm, and significant emotional distress. Defendant acted intentionally or with reckless indifference to Plaintiff's ADA rights, entitling him to compensatory and punitive damages, attorneys' fees, and all other relief permitted by law.

## COUNT III —  ADA 'REGARDED AS' DISABILITY DISCRIMINATION ADA
### (42 U.S.C. § 12102(1)(C))

94.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

## COUNT IV — ADA RETALIATION

### (ADA, 42 U.S.C. § 12203)

95.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

96.  The ADA, 42 U.S.C. § 12203(a), prohibits retaliation against an employee for engaging in protected activity, including requesting accommodations, seeking or taking medical leave, opposing disability-based discrimination, or otherwise exercising ADA rights.

97.  Plaintiff engaged in multiple protected activities, including:

   a.  notifying HR in January 2022 of his disabling medical conditions and requesting continuous leave supported by medical certification;

   b.  taking continuous leave from January to April 2022;

   c.  requesting intermittent leave and continued remote-work accommodation in May 2022;

   d.  advising HR that his physician prescribed periodic intermittent leave;

   e.  advocating during the July 2022 SDR meeting for respect for medical accommodations; and

   f.  notifying HR on September 7, 2022 of his immediate need for intermittent leave per physician instructions.

98.  Benchling's managers and HR personnel—including Director of Sales Development Sean Simerly, SDR Manager Christian Haas-Kwon, and HR staff (Emily Kirsch and Maggie Lee)—were fully aware of Plaintiff's disabilities, leave history, and accommodation requests.

99.  After Plaintiff engaged in the foregoing protected activities, Benchling materially altered its treatment of him. Management excluded him from developmental opportunities, reassigned

key accounts, denied him attendance at conferences, and marginalized him from meetings and team functions—actions that materially hindered his performance, visibility, and advancement.

100.    These adverse actions occurred in close temporal proximity to Plaintiff's protected activities and were accompanied by a marked negative shift in management tone and engagement.

101.    On September 15, 2022—only eight days after Plaintiff notified HR of his physician-directed need for intermittent leave—Benchling abruptly terminated his employment. The termination occurred without warnings, discipline, or performance documentation and was delivered in a brief meeting with Mr. Haas-Kwon and HR Director Maggie Lee.

102.    Benchling's stated rationale of "performance issues" was false and pretextual. Plaintiff had achieved 100% of quota in FY23 Q2, led his segment in enterprise pipeline generation, and had been told by his manager weeks earlier to prepare for promotion in December.

103.    The temporal proximity between Plaintiff's September 7 accommodation request and his September 15 termination, combined with the absence of any articulated performance concerns and Plaintiff's strong metrics, supports a compelling inference of retaliatory motive.

104.    Post-termination HR communications further demonstrate pretext. When Plaintiff questioned the timing of his termination relative to his medical disclosures, HR falsely asserted there had been "months" of warnings—fabrications made only after the fact to justify a retaliatory decision already taken.

105.    Benchling's subsequent efforts to pressure Plaintiff to sign a release of claims, including threats of ISO forfeiture and conditioning benefits on waiver, constituted continuing retaliation and attempted suppression of protected activity.

106.    Defendant's conduct violates 42 U.S.C. § 12203(a) because Plaintiff's protected assertions of ADA rights were a but-for and motivating factor in the adverse actions taken against him, including termination.

107.    As a direct and proximate result, Plaintiff suffered loss of employment, wages, benefits, career opportunities, and severe emotional distress. Defendant acted intentionally or with reckless indifference to Plaintiff's federally protected rights, entitling him to compensatory and punitive damages, attorneys' fees, costs, and all other appropriate relief.

## COUNT V — INTERFERENCE WITH RIGHTS UNDER THE FMLA

### (FMLA, 29 U.S.C. § 2615(a)(1))

108.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

109.    The FMLA, 29 U.S.C. § 2615(a)(1), prohibits employers from interfering with, restraining, or denying the exercise of FMLA rights, including the right to take protected leave, to reinstatement, and to be free from discouragement for exercising such rights.

110.    Plaintiff was an eligible employee under 29 U.S.C. § 2611(2), having worked for Benchling for more than twelve months and well over 1,250 hours in the preceding year. Benchling was a covered employer under 29 U.S.C. § 2611(4).

111.    Plaintiff suffered from medically certified serious health conditions—major depressive disorder, generalized anxiety disorder, and severe insomnia—rendering him unable to perform essential job functions during flare-ups, and thus qualifying under 29 U.S.C. § 2611(11).

112.    In January 2022, Plaintiff notified HR of his need for continuous medical leave, and on February 6, 2022, his provider submitted a certification confirming the need for leave through April 18, 2022. Benchling approved the leave, acknowledging its FMLA protection. Plaintiff

satisfied all notice and procedural requirements under 29 C.F.R. §§ 825.302–305 and timely notified Benchling of his April 18 return.

113.    Instead of restoring Plaintiff to the same or an equivalent position as required by 29 U.S.C. § 2614(a)(1), Benchling barred him from account work and commission-earning duties until May 1, 2022—with no medical or business justification—causing lost earnings and violating statutory reinstatement rights.

114.    In May 2022, Plaintiff requested physician-supported intermittent leave and continued remote-work flexibility. Although remote work was nominally permitted, Benchling immediately undermined his working conditions by removing accounts, excluding him from meetings, and diminishing his visibility—conduct that discouraged continued use of FMLA leave in violation of 29 C.F.R. § 825.220(b).

115.    On September 7, 2022, Plaintiff notified HR that he would need to take intermittent leave in the coming weeks. HR acknowledged approval and directed him to coordinate logistics with his manager. Before Plaintiff could exercise any portion of this leave, Benchling terminated his employment on September 15, 2022—without warning, documentation, or performance rationale.

116.    By (a) delaying reinstatement following continuous leave, (b) discouraging Plaintiff's continued use of FMLA accommodations, and (c) terminating him immediately after he provided notice of imminent intermittent leave, Benchling interfered with, restrained, and denied rights guaranteed by 29 U.S.C. § 2615(a)(1).

117.    As a direct and proximate result, Plaintiff suffered lost wages, commissions, and benefits, as well as loss of professional standing and significant emotional distress. Defendant's conduct

was willful under 29 U.S.C. § 2617(a)(3), entitling Plaintiff to economic damages, liquidated damages, interest, attorneys' fees, and costs.

## COUNT VI — FAILURE TO REINSTATE UNDER FMLA

### (29 U.S.C. § 2614(a), 29 C.F.R. §§ 825.214–220)

118.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

119.    The Family and Medical Leave Act guarantees an eligible employee the right to be restored to the same or an equivalent position immediately upon return from FMLA leave. 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.214. This reinstatement obligation is separate and independent from the prohibitions on interference and retaliation under 29 U.S.C. § 2615.

120.    Plaintiff was an eligible employee under the FMLA. Benchling was a covered employer. Plaintiff's treating provider certified his serious health condition and his need for continuous FMLA leave from January 24 through April 18, 2022. Benchling approved the leave and acknowledged it was job-protected.

121.    Plaintiff returned to work on April 18, 2022 with full medical clearance. Upon his return, Benchling refused to restore him to the same or an equivalent position. Instead, Benchling:

    a.    barred him from performing essential job duties until May 1, 2022;

    b.    denied access to revenue-generating accounts and commission-eligible work;

    c.    restricted system access necessary to execute his role; and

    d.    provided no business, operational, or medical justification for the two-week exclusion.

122.    This reinstatement delay violated 29 U.S.C. § 2614(a) and 29 C.F.R. §§ 825.214–216, which require restoration immediately upon return from leave and prohibit employers from limiting duties or curtailing compensation opportunities upon reinstatement.

123.    The deprivation was material: Plaintiff lost two weeks of pipeline development, commissions, enterprise account access, and quota-bearing activity solely because he had exercised his FMLA rights.

124.    Because the reinstatement obligation is strict and non-discretionary, Benchling's failure to return Plaintiff to his full duties on April 18, 2022 independently constitutes a per se violation of § 2614(a), even apart from other interference or retaliatory acts.

125.    As a direct and proximate result, Plaintiff suffered lost wages, lost commissions, lost benefits, and associated economic damages. Benchling's violation was willful within the meaning of 29 U.S.C. § 2617(a)(3), entitling Plaintiff to liquidated damages, back pay, front pay or reinstatement, pre- and post-judgment interest, attorneys' fees, and all other relief available under the FMLA.

## COUNT VII — RETALIATION FOR EXERCISING RIGHTS UNDER THE FMLA

### (FMLA, 29 U.S.C. § 2615(a)(2))

126.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

127.    The FMLA, 29 U.S.C. § 2615(a)(2), prohibits employers from discharging or discriminating against an employee for exercising or attempting to exercise FMLA rights.

128.    Plaintiff engaged in protected FMLA activity by:

    a.   requesting and taking continuous FMLA leave from January to April 2022;

    b.   notifying HR in May 2022 of his need for intermittent leave and related

        accommodations; and

    c.   informing HR on September 7, 2022 that he required physician-prescribed

        intermittent leave in the upcoming weeks.

129.    Each activity was protected under 29 U.S.C. § 2612(a) and 29 C.F.R. §§ 825.220,

825.302. Benchling's leadership and HR personnel—including Director of Sales Development

Sean Simerly, SDR Manager Christian Haas-Kwon, HR Director Maggie Lee, and HR Generalist

Emily Kirsch—were aware of Plaintiff's leave history and protected status.

130.    Following Plaintiff's exercise of FMLA rights, Defendant initiated a pattern of adverse

treatment, including: (a) delaying reinstatement to full duties for two weeks after his April 2022

return; (b) excluding him from conferences, projects, and promotion pathways despite strong

performance; (c) reassigning key accounts mid-quarter; and (d) marginalizing him within the

team and treating him as a liability because of his medical condition and leave usage.

131.    The retaliatory sequence culminated on September 15, 2022—only eight days after

Plaintiff notified HR of imminent intermittent leave—when Benchling terminated his

employment without warning, documentation, or legitimate rationale. Defendant's stated reason

of "performance issues" was pretextual. Plaintiff had achieved 100% of his FY23 Q2 quota, led

his segment in enterprise pipeline generation, and had been encouraged by his manager in

August to prepare for a December promotion. No performance deficiencies were documented,

and no PIP or corrective plan existed.

132.    The close temporal proximity between Plaintiff's September 7 protected activity and his September 15 termination, paired with Plaintiff's strong metrics and the lack of any legitimate justification, establishes a compelling inference of retaliatory causation.

133.    Defendant's post-termination conduct further evidences retaliation. HR attempted to coerce Plaintiff into signing a release of claims by threatening forfeiture of vested stock options and loss of COBRA coverage—conduct intended to suppress protected activity and conceal Defendant's retaliatory motive.

134.    Defendant's actions constitute retaliation in violation of 29 U.S.C. § 2615(a)(2) and 29 C.F.R. § 825.220(c). As a direct and proximate result, Plaintiff suffered lost wages, benefits, commissions, and career opportunities, along with emotional distress and reputational harm.

135.    Defendant's retaliation was willful and undertaken with reckless disregard for Plaintiff's federally protected rights. Plaintiff is therefore entitled to all remedies under 29 U.S.C. § 2617(a), including back pay, front pay or reinstatement, liquidated damages, interest, attorneys' fees, and costs.

## VIII - XII — MASSACHUSETTS EMPLOYMENT AND LEAVE

## COUNT VIII — DISABILITY DISCRIMINATION UNDER CH. 151B
### (M.G.L. c. 151B § 4(16))

136.    Plaintiff realleges and incorporates all preceding paragraphs.

137.    Plaintiff is a qualified individual with a disability within the meaning of M.G.L. c. 151B, § 1(16), and was able to perform the essential functions of his position with or without reasonable accommodation. Defendant Benchling had actual knowledge of Plaintiff's disabling

conditions, received timely medical documentation, and was aware of his need for medical leave and flexibility.

138.    After Plaintiff exercised his rights and despite Plaintiff's strong performance, Defendant treated him less favorably than similarly situated employees, restricted his duties following medical leave, marginalized him within the SDR team, and ultimately terminated his employment because of his disability or because it regarded him as disabled.

139.    Defendant's conduct violated M.G.L. c. 151B § 4(16). As a direct and proximate result, Plaintiff suffered economic loss, emotional distress, reputational harm, and other compensable damages. Defendant's actions were willful or undertaken with reckless disregard for Plaintiff's rights, entitling him to compensatory and punitive damages, attorneys' fees, and costs under § 9.

## COUNT IX — MASSACHUSETTS CH. 151B – FAILURE TO REINSTATE
### (M.G.L. c. 151B §§ 4(16), 4(1E))

140.    Plaintiff repeats and incorporates by reference all preceding paragraphs.

141.    Plaintiff is a qualified individual with a disability within the meaning of M.G.L. c. 151B § 1(16). Benchling, Inc. is an "employer" covered by M.G.L. c. 151B §§ 1(5) and 4.

142.    Massachusetts disability law imposes an independent duty to reinstate an employee returning from protected medical leave to the same or equivalent position, with equivalent compensation, privileges, and responsibilities. Benchling had actual knowledge of Plaintiff's disabling conditions and his approved medical leave from January 24 to April 18, 2022.

143.    Upon Plaintiff's full medical clearance and return to work on April 18, 2022, Benchling violated M.G.L. c. 151B §§ 4(16) and 4(1E) by refusing to restore him to his prior duties and opportunities. Instead of reinstating him immediately, Benchling:

    a.   barred him from performing essential SDR functions for two weeks,

    b.   withheld access to enterprise accounts and commission-bearing work,

    c.   restricted system and workflow access, and

    d.   provided no legitimate medical or business justification for the delay.

144.    This two-week reinstatement obstruction deprived Plaintiff of income, commissions, pipeline development, and material terms and conditions of employment solely because he exercised protected medical-leave rights and had a known disability.

145.    The failure to reinstate constitutes a discrete violation of Massachusetts law, independent of discrimination, interference, or retaliation theories. Benchling's conduct was willful, knowing, and undertaken with reckless disregard for Plaintiff's statutory rights under M.G.L. c. 151B.

146.    As a direct and proximate result, Plaintiff suffered lost wages, lost commissions, reputational harm, and emotional distress. Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, costs, and all other relief authorized by M.G.L. c. 151B § 9.

## COUNT X — PFMLA INTERFERENCE

147.    Plaintiff repeats and incorporates by reference all preceding allegations as if fully set forth herein.

148.    At all relevant times, Plaintiff was a qualified disabled person within the meaning of M.G.L. c. 151B, § 1(16) and was capable of performing the essential functions of his position with or without reasonable accommodation.

149.    Defendant Benchling, Inc. is an employer as defined by M.G.L. c. 151B, § 1(5) and is subject to the requirements of Chapter 151B.

150.    Defendant was aware of Plaintiff's disability and medical conditions and received timely, documented requests for reasonable accommodations, including medical leave and remote work flexibility.

151.    Defendant failed to engage in the required interactive dialogue with Plaintiff and failed to reasonably accommodate his known disability, in violation of its statutory duties.

152.    Defendant ultimately terminated Plaintiff in whole or in part because of his disability and/or because he sought accommodation for it.

153.    As a direct and foreseeable result of Defendant's unlawful discrimination, Plaintiff has suffered loss of income, loss of employment benefits, emotional distress, and other compensable injuries.

154.    Defendant's conduct was willful, knowing, and/or undertaken with reckless disregard of Plaintiff's rights under Massachusetts law, entitling Plaintiff to compensatory and punitive damages, as well as reasonable attorneys' fees and costs under M.G.L. c. 151B, § 9.


### COUNT XI — PFMLA INTERMITTENT LEAVE INTERFERENCE

155.    Plaintiff repeats and incorporates by reference all preceding paragraphs.

156.    Plaintiff was a covered employee under the Massachusetts Paid Family and Medical Leave Act ("PFMLA"), M.G.L. c. 175M. Defendant Benchling, Inc. was a covered employer at all relevant times.

157.    In September 2022, Plaintiff's treating physician formally prescribed intermittent medical leave to manage continuing symptoms of Plaintiff's documented health conditions. On September 7, 2022, Plaintiff notified HR Generalist Emily Kirsch of his need to take intermittent PFMLA leave in the upcoming weeks and provided the required medical basis. Ms. Kirsch

acknowledged the request, confirmed that intermittent leave was covered, and instructed Plaintiff to coordinate scheduling logistics with management in their next one-on-one meeting.

158.    The PFMLA guarantees an employee's right to take qualified intermittent leave, prohibits any employer conduct that restrains or interferes with that right, and independently protects an employee's right to attempt to exercise intermittent leave. M.G.L. c. 175M § 9(d).

159.    Rather than engage in any dialogue or implement the intermittent leave prescribed by Plaintiff's physician, Benchling took immediate adverse action. On September 15, 2022—only eight days after Plaintiff's protected disclosure—Benchling abruptly terminated him without warning, documentation, discipline, or performance basis. This termination prevented Plaintiff from taking any portion of the intermittent PFMLA leave for which he was fully eligible and directly interfered with statutory rights he had begun to exercise.

160.    Benchling's decision to terminate Plaintiff immediately after receiving notice of imminent intermittent leave, and before any portion of that leave could be taken, constitutes unlawful interference under M.G.L. c. 175M, § 9(d). The temporal proximity, absence of any legitimate justification, and post-hoc fabrication of "performance concerns" confirm that the termination was designed to obstruct Plaintiff's use of PFMLA-protected intermittent leave.

161.    As a direct and foreseeable result of Benchling's unlawful interference, Plaintiff suffered lost wages, lost benefits, lost commissions, and other economic damages; emotional distress; and disruption of medical care. Under M.G.L. c. 175M § 9(d) and c. 149 § 150, Plaintiff is entitled to mandatory treble damages, attorneys' fees, costs, and all other relief this Court deems just and proper.

## COUNT XII — MASSACHUSETTS PFMLA - RETALIATION

162.    Plaintiff repeats and incorporates by reference all preceding paragraphs.

163.    At all relevant times, Plaintiff was a covered employee entitled to leave under the Massachusetts Paid Family and Medical Leave Act (PFMLA), M.G.L. c. 175M, and Defendant was a covered employer.

164.    In January 2022, Plaintiff applied for and was granted paid medical leave benefits through the Massachusetts Department of Family and Medical Leave (DFML). Defendant approved his leave and was aware of the underlying qualifying health condition.

165.    In addition to exercising his own PFMLA rights, Plaintiff also engaged in protected activity by joining a July 2022 SDR team meeting in solidarity with colleagues to oppose Defendant's stricter return-to-office policy, which Plaintiff reasonably believed was unfair, discriminatory, and inconsistent with the equal rights of employees under Massachusetts law, including those requiring medical leave or accommodations.

166.    On or about September 7, 2022, Plaintiff notified Defendant's HR personnel of his intent to take an additional period of intermittent PFMLA leave in the coming weeks, consistent with medical guidance.

167.    Just eight days later, on September 15, 2022, Defendant abruptly terminated Plaintiff's employment without prior warning or substantiated performance documentation.

168.    Plaintiff's termination occurred in close temporal proximity to his protected request for PFMLA leave and after his prior exercise of PFMLA rights earlier in the year.

169.    Defendant's conduct constitutes retaliation in violation of M.G.L. c. 175M, § 9(d), which prohibits employers from taking any adverse action against an employee for exercising rights under the Act or applying for leave benefits.

170.    As a result of Defendant's unlawful retaliation, Plaintiff has suffered lost wages, lost

benefits, emotional distress, reputational harm, and other compensable injuries.

171.    Pursuant to M.G.L. c. 175M, § 9(d) and M.G.L. c. 149, § 150, Plaintiff is entitled to treble

damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, and any other

relief This Court deems just and proper.

## XIII - XVI — CALIFORNIA EMPLOYMENT & LEAVE

## COUNT XIII — DISABILITY DISCRIMINATION UNDER THE CALIFORNIA FEHA
### (Cal. Gov. Code § 12940(a))

172.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

173.    Benchling, Inc. is headquartered in California and is an "employer" within the meaning

of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940 et seq.

FEHA applies extraterritorially to California employers when the challenged adverse decisions,

policies, and managerial directives originate in California and are executed by California-based

leadership—as they were here.

174.    Plaintiff is an individual with disabilities within the meaning of Cal. Gov. Code §

12926(j)–(m). Plaintiff's medically documented conditions—including major depressive

disorder, generalized anxiety disorder, and severe insomnia—substantially limited major life

activities such as sleep, concentration, and neurological regulation. Benchling had actual

knowledge of these disabilities no later than January 2022, when Plaintiff submitted medical

certification to HR and notified his direct manager.

175.    California-based executives, including CEO Sajith Wickramasekara and Director of Sales Development Sean Simerly, directly influenced the adverse employment actions taken against Plaintiff. These executives set policy, supervised the SDR organization, and ratified or approved the RTO mandates, leave-related restrictions, opportunity curtailments, and ultimately the termination decision. These executives exercised centralized authority over SDR operations nationwide, and their directives constituted the controlling cause of Plaintiff's adverse actions. California executives ratified, approved, or knowingly permitted the discriminatory and retaliatory actions directed at Plaintiff. Under *Rains v. Criterion Systems, Inc.* and *Warfield v. Peninsula Golf*, FEHA applies extraterritorially where adverse actions are conceived, decided, or ratified in California—even if their effects are felt out of state. Benchling's conduct satisfies that standard.

176.    The adverse employment decisions at issue—including the post-leave restrictions, the account removals, the opportunity curtailments, and the termination itself—were made, approved, or ratified by California-based executives acting from within the state. Because the operative decisions emanated from California and were implemented under the authority of California leadership, FEHA applies extraterritorially to the conduct directed at Plaintiff in Massachusetts.

177.    Benchling discriminated against Plaintiff "because of" disability within the meaning of Cal. Gov. Code § 12940(a), including by:

    a.  Delaying reinstatement for two weeks after full medical clearance, thereby depriving Plaintiff of income and opportunity;

    b.  Excluding Plaintiff from conferences and removing key accounts after his return from leave;

c.  Treating Plaintiff as unreliable or burdensome due to his disability-related needs; and

d.  Terminating Plaintiff eight days after notifying HR of physician-prescribed intermittent leave.

178.    The "performance" rationale asserted post-termination was pretextual. Plaintiff had reached 100% of quota, led the Enterprise SDR team in pipeline, and had been encouraged to prepare for an internal promotion only weeks before termination.

179.    The temporal proximity, pattern of differential treatment, absence of progressive discipline, and post-hoc HR fabrication of "months of performance discussions" all demonstrate discriminatory intent.

180.    As a direct and proximate result, Plaintiff suffered lost wages, future earnings, emotional distress, and loss of professional standing. Benchling's conduct was willful, oppressive, and committed with reckless disregard for Plaintiff's rights, entitling Plaintiff to compensatory and punitive damages, attorneys' fees, and all other relief available under FEHA.

## COUNT XIV — FAILURE TO PROVIDE REASONABLE ACCOMMODATION AND FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS

### (Cal. Gov. Code § 12940(m), (n))

181.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

182.    Under Cal. Gov. Code §§ 12940(m) and (n), employers must provide (1) reasonable accommodations for known disabilities and (2) must engage in a timely, good-faith interactive process when accommodation is requested or necessary. Benchling failed both obligations.

183.    Benchling knew no later than January 2022 that Plaintiff had documented disabilities. Instead of initiating any interactive dialogue upon Plaintiff's return in April 2022, Benchling immediately restricted him from performing his essential job duties until May 1, 2022, without medical, operational, or business necessity. This deprivation of reinstatement constituted a denial of accommodation under California law.

184.    In May 2022, Plaintiff provided written medical documentation requesting intermittent leave and the continuation of remote-work flexibility. Benchling purported to approve these requests but acted in direct contradiction by:

      a.  Removing multiple enterprise accounts mid-quarter;

      b.  Excluding Plaintiff from key meetings and developmental opportunities;

      c.  Deploying a uniquely punitive RTO regime that subjected SDRs to harsher treatment than all other departments; and

      d.  Treating Plaintiff's accommodation needs as a basis for marginalization rather than support.

185.    On September 7, 2022, Plaintiff expressly informed HR that he required intermittent leave in the coming weeks pursuant to physician directive. Benchling responded by terminating him eight days later without engaging in any meaningful discussion regarding accommodation options or feasibility.

186.    Benchling never explored modified schedules, leave timing, workload adjustments, or other readily available accommodations, and violated FEHA's procedural and substantive mandates.

187.    As a direct result of Benchling's unlawful conduct, Plaintiff suffered lost wages, loss of future earning capacity, emotional distress, and professional harm. Benchling's failures were

intentional or undertaken in reckless disregard of Plaintiff's rights. Plaintiff is entitled to all relief authorized by Cal. Gov. Code §§ 12965(b)–(c), including compensatory damages, punitive damages, equitable relief, and attorneys' fees.

## **COUNT XV — RETALIATION UNDER THE CALIFORNIA FEHA**

### **(Cal. Gov. Code § 12940(h))**

188.    Plaintiff realleges and incorporates all preceding paragraphs.

189.    Under Cal. Gov. Code § 12940(h), it is unlawful for an employer to retaliate against an employee for engaging in protected activity under FEHA, including requesting accommodations, taking protected medical leave, or opposing disability-related discrimination.

190.    Plaintiff engaged in protected activity under FEHA by:

    a.  Requesting continuous medical leave in January 2022;

    b.  Exercising that leave through April 2022;

    c.  Requesting intermittent medical leave in May 2022;

    d.  Submitting medical documentation supporting remote-work accommodation;

    e.  Participating in the July 2022 all-hands SDR meeting where he advocated for equitable treatment and reiterated accommodation rights; and

    f.  Providing HR with notice on September 7, 2022 of his upcoming need for intermittent leave.

191.    Benchling's California-based leadership—including SDR Director Sean Simerly—viewed Plaintiff's protected activities as disloyalty or disruption. After July 2022, Benchling escalated hostile treatment, including account removal, exclusion from opportunities, and increased scrutiny.

192.    The retaliatory campaign culminated in Plaintiff's abrupt termination on September 15, 2022—eight days after notifying HR of imminent leave. No warnings, performance plans, or prior concerns existed. The alleged "performance" rationale was fabricated and contradicted by Plaintiff's documented strong performance, quota attainment, pipeline leadership, and prior promotion assurances.

193.    The close temporal proximity, evidence of escalating hostility, and falsification of performance history all support a strong inference of retaliatory intent under FEHA.

194.    As a proximate result, Plaintiff has suffered substantial economic and non-economic damages. Benchling's conduct was malicious, oppressive, and undertaken with conscious disregard for Plaintiff's FEHA-protected rights. Plaintiff seeks all remedies available under FEHA, including punitive damages and attorneys' fees.

## COUNT XVI — INTERFERENCE AND RETALIATION UNDER THE CALIFORNIA FAMILY RIGHTS ACT

### (Cal. Gov. Code § 12945.2)

195.    Plaintiff realleges and incorporates all preceding paragraphs.

196.    The California Family Rights Act ("CFRA"), Cal. Gov. Code § 12945.2, guarantees eligible employees up to 12 weeks of job-protected leave for their own serious health condition and prohibits employers from interfering with or retaliating against employees for exercising or attempting to exercise CFRA rights.

197.    Benchling is a covered employer under CFRA, and Plaintiff was fully eligible for CFRA leave at all relevant times.

198.    Plaintiff exercised CFRA rights by taking medically certified continuous leave from January through April 2022. Plaintiff also sought CFRA-protected intermittent leave beginning in May 2022 and again on September 7, 2022, when he notified HR of physician-directed leave to commence in upcoming weeks.

199.    Benchling interfered with Plaintiff's CFRA rights by:

    a.  Delaying reinstatement by two weeks after April 18, 2022;

    b.  Immediately reducing access to accounts, commissions, and opportunities;

    c.  Creating a hostile environment designed to discourage further CFRA use; and

    d.  Terminating Plaintiff before intermittent leave could be taken.

200.    Benchling retaliated against Plaintiff for exercising CFRA rights by executing a termination mere days after Plaintiff notified HR of physician-prescribed leave. The termination decision occurred without documentation, warnings, or legitimate justification and immediately followed Plaintiff's protected disclosures.

201.    The adverse action was causally connected to Plaintiff's CFRA activity. Benchling's stated rationale was pretextual in light of Plaintiff's superior performance, promotion assurances, and lack of any contemporaneous performance concerns.

202.    As a direct result, Plaintiff suffered substantial economic and emotional damages. Plaintiff is entitled to all CFRA remedies, including reinstatement or front pay, back pay, compensatory damages, punitive damages, and attorneys' fees under Cal. Gov. Code § 12965(b).

## XVII - XVIII — FEDERAL WHISTLEBLOWER STATUTES

## COUNT XVII — RETALIATION UNDER THE SARBANES–OXLEY (SOX) ACT §806

**(18 U.S.C. §1514A)**

203.    Plaintiff realleges and incorporates all preceding paragraphs.

204.    Benchling, Inc. is a privately held Delaware corporation whose business activities involve the development, licensing, and implementation of R&D informatics software for biotechnology and pharmaceutical companies. Benchling's operations, revenue recognition practices, data-integrity systems, internal controls, and investor-facing performance metrics constitute "activities of a company with a class of securities registered under section 12 of the Securities Exchange Act" and/or "required to file reports under section 15(d)," and otherwise fall within the scope of 18 U.S.C. § 1514A and its broad coverage of officers, employees, contractors, and agents of such companies and their subsidiaries and affiliates.

205.    The sequence of events materially supports an inference of retaliatory causation: (a) July–August 2022: Plaintiff raised objections to revenue-inflation practices; (b) August 2022: Plaintiff continued escalating those concerns after being instructed to follow the rule; (c) September 7, 2022: Plaintiff notified HR of physician-directed intermittent leave; (d) September 15, 2022: Benchling terminated Plaintiff without warning, despite recent praise and promotion assurances. This tight temporal proximity, coupled with the absence of any documented performance issue, satisfies the contributing-factor standard under SOX and Dodd–Frank.

206.    Section 806 of the Sarbanes–Oxley Act, 18 U.S.C. § 1514A(a)(1), prohibits employers from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee because the employee engaged in protected whistleblowing activity regarding what he reasonably believed constituted (a) mail fraud (18 U.S.C. § 1341), (b) wire fraud (18 U.S.C. § 1343), (c) bank fraud, (d) securities fraud (18 U.S.C. § 1348), (e)

violations of SEC rules or regulations, or (f) violations of any federal law relating to fraud against shareholders.

207.    In or around August 2022, Plaintiff engaged in protected activity under § 1514A when he raised concerns to his manager, Christian Haas-Kwon, that Benchling's mandated Enterprise Sales "deal size" rule—which instructed SDRs to enter a uniform $250,000 enterprise value for every opportunity regardless of actual contract likelihood, discovery-call notes, or historical deal patterns—created inflated pipeline metrics, distorted the accuracy of internal performance reporting, and did not reflect legitimate revenue expectations. Plaintiff expressed discomfort with entering inflated values and articulated concerns about the integrity, reliability, and fairness of reported pipeline and ARR impacts.

208.    Plaintiff reasonably believed that Benchling's mandated inflation of opportunity values:

        a.   misrepresented material financial metrics to management, board members, investors, and potential acquirers;

        b.   constituted false statements regarding revenue expectations, pipeline quality, and performance;

        c.   constituted deceptive internal controls and violations of laws relating to fraud against shareholders; and

        d.   created material inaccuracies in information used to make financial, governance, and compensation determinations.

209.    These beliefs satisfy the "reasonable belief" standard under § 1514A, which requires neither actual fraud nor knowledge of precise statutory provisions.

210.    Plaintiff's belief was further supported by the fact that enterprise-pipeline metrics, including the uniform $250,000 deal-value rule, were incorporated into real-time internal

dashboards reviewed by senior management and disseminated to investors, prospective investors, and board-level governance bodies. These metrics influenced revenue modeling, valuation assumptions, performance-compensation frameworks, and internal controls subject to Section 404 of the Sarbanes–Oxley Act. The inflation of opportunity values therefore created material deviations from actual ACV expectations and constituted the type of internal-controls circumvention and financial-integrity failure SOX was designed to prevent.

211.    Plaintiff's belief was objectively reasonable under the First Circuit's standard, which requires only that a reasonable person with Plaintiff's training, experience, and access to information could believe the conduct at issue implicated securities fraud, shareholder fraud, or internal-controls failures. Day v. Staples, Inc., 555 F.3d 42, 55–58 (1st Cir. 2008). The mandated $250,000 enterprise-value rule, its incorporation into valuation dashboards, and its influence on revenue forecasting rendered Plaintiff's concerns objectively grounded in the type of financial-integrity risks § 1514A was enacted to prevent.

212.    Plaintiff's objections were explicit and documented in discussions with his manager. Rather than investigate or escalate Plaintiff's concerns, management instructed him to "follow the rules" and continue entering inflated metrics, thereby confirming knowledge of the practice and internal resistance to scrutiny.

213.    After Plaintiff lodged these concerns and questioned the legitimacy of inflated values, Benchling's treatment of him materially changed. Management began removing key accounts, excluding him from opportunities, and expressing hostility to his protected conduct.

214.    On September 7, 2022, Plaintiff informed HR of his need for physician-directed intermittent leave. Only eight days later, on September 15, 2022—and weeks after raising objections to revenue-inflation practices—Benchling abruptly terminated Plaintiff without

warning, documentation, or any negative performance history. The "performance" rationale was obviously pretextual and contradicted by Plaintiff's superior metrics, including his FY23Q2 achievement of 100% quota and his leadership in pipeline generation.

215.    The proximity between Plaintiff's internal objections and his termination, coupled with fabricated HR explanations ("months of performance discussions" that never occurred and in-fact reference the very period of time when sales values were inflated), a sudden reversal of previously positive evaluations, and the coercive pressure campaign for to sign a severance agreement and general release, establishes that Plaintiff's protected activity was a contributing factor to his termination.

216.    Additional circumstantial evidence of retaliatory motive includes:

    a.  spoliation of the "Benchling Offer Illustrator" file after litigation became foreseeable;

    b.  the Company's failure to maintain internal controls and accurate records;

    c.  rapid escalation to post-termination coercion;

    d.  concealment of Benchling's default-on call-recording system that captured Plaintiff's communications; and

    e.  the company's inconsistent explanations regarding Plaintiff's separation.

217.    Under the burden-shifting framework of § 1514A(b)(2)(C), once Plaintiff demonstrates that protected activity was a contributing factor in his termination, the employer must prove by clear and convincing evidence that it would have terminated him absent the protected conduct. Benchling cannot meet this standard in light of Plaintiff's outstanding performance metrics, recent promotion assurances, the absence of any prior discipline, and the contradictory and fabricated nature of the "performance" explanation.

218.    Procedural Exhaustion. Plaintiff satisfied the filing prerequisite under 18 U.S.C. § 1514A(b)(1)(A) by submitting a whistleblower complaint to OSHA.

219.    As a direct and proximate result of Benchling's violation of § 1514A, Plaintiff suffered lost wages, lost benefits, emotional distress, reputational harm, diminished career prospects, and other compensable injuries. Plaintiff is entitled to reinstatement (or front pay), back pay with interest, special damages, litigation costs, expert fees, attorney's fees, and all other remedies authorized by 18 U.S.C. § 1514A(c).

## COUNT XVIII — RETALIATION UNDER THE DODD–FRANK ACT §21F(h)

## (15 U.S.C. §78u-6(h))

220.    Plaintiff realleges and incorporates all preceding paragraphs.

221.    Section 21F(h)(1)(A) of the Securities Exchange Act, codified at 15 U.S.C. § 78u-6(h), prohibits an employer from discharging, demoting, suspending, threatening, harassing, or otherwise discriminating against a "whistleblower" for engaging in protected activity, including providing information to the Securities and Exchange Commission ("SEC"), assisting an SEC investigation, or making disclosures required or protected under the Sarbanes–Oxley Act, the Exchange Act, or any other law subject to SEC jurisdiction.

222.    Plaintiff is a "whistleblower" within the meaning of § 78u-6(a)(6) because he provided information regarding Benchling's revenue-metric inflation, internal-controls deficiencies, and potential financial misrepresentations to the SEC through a TCR (Tips, Complaint or Referral) filing. Plaintiff's whistleblower status attaches upon providing information to the SEC, and § 21F(h) protects a whistleblower from retaliation for conduct occurring *before or after* the formal SEC submission where the retaliatory motive is tied to the same subject matter of the disclosure.

223.    Independently, § 21F(h)(1)(A)(iii) protects employees from retaliation for making internal disclosures that are required or protected under SOX or the Exchange Act, including internal objections to data-integrity failures, financial-reporting inaccuracies, metrics falsification, or the circumvention of internal controls. Plaintiff made such disclosures when he objected to Benchling's mandated inflation of enterprise-opportunity values to a uniform $250,000 figure regardless of actual ACV prospects, customer feedback, or operative facts. Plaintiff expressed concerns that this practice distorted performance metrics, artificially inflated pipeline reporting, and created inaccurate financial and operational information relied upon by management and prospective investors.

224.    Plaintiff reasonably believed that the inflated-revenue-metrics practice implicated securities-related violations, including the creation of materially misleading internal financial data, the failure to maintain accurate books and records, and the circumvention of internal controls required under the Exchange Act and SEC rules. These communications constitute protected activity under § 78u-6(h)(1)(A)(iii).

225.    Plaintiff's disclosed the basis of the irregularities to his manager, Christian Haas-Kwon. Management responded not by investigating the concerns, but by instructing Plaintiff to adhere to the inflation rule outlined in the Enterprise Sales rulebook document, thereby confirming awareness of the practice and hostility toward Plaintiff's objections.

226.    After Plaintiff raised these objections, Benchling engaged in adverse treatment, including account changes and marginalization within the SDR organization.

227.    On September 7, 2022, Plaintiff notified HR of his physician-directed need for intermittent medical leave. Eight days later—after months of strong performance, quota attainment, leading his segment in pipeline, and receiving promotion assurances—Benchling

abruptly terminated Plaintiff on September 15, 2022 without warning or documentation. The "performance" explanation was pretextual and contradicted by Benchling's internal dashboards, AE feedback, and Haas-Kwon's promotion directives.

228.    Benchling's retaliatory motive is reinforced by:

    a.    the temporal proximity between Plaintiff's internal disclosures and his termination;

    b.    the fabrication of "months" of performance warnings that never occurred and relate directly to the period of time in which the inflated $250,000 sales values appeared;

    c.    post-termination pressure to sign a general release of liability through threats of ISO "disqualification";

    d.    deletion of the "Benchling Offer Illustrator" file after litigation became foreseeable; and

    e.    concealment of a default-on call-recording system that captured Plaintiff's communications and performance without disclosure.

229.    Section 21F(h) employs the same "contributing factor" causation standard that governs SOX retaliation claims. Courts construing § 78u-6(h) apply the identical burden-shifting structure because Congress incorporated SOX's statutory language into Dodd–Frank's retaliation scheme. No higher or "but-for" causation standard applies. Defendant must therefore prove by clear and convincing evidence that it would have taken the same action absent Plaintiff's protected disclosures—a burden it cannot meet given Plaintiff's superior performance metrics and the absence of any contemporaneous performance concerns.

230.    Benchling's actions constitute discrimination "because of" Plaintiff's whistleblowing within the meaning of § 78u-6(h), which requires only that the protected activity was a contributing factor in the adverse action. That standard is met where, as here, the employer acted with hostility toward protected disclosures, provided shifting and unsupported explanations, and terminated the employee after strong performance and without any intervening documentation of concern.

231.    Under § 78u-6(h)(1)(B)(iii), the burden shifts to the employer to prove by clear and convincing evidence that it would have taken the same action absent the protected conduct. Benchling cannot meet this burden in light of Plaintiff's documented performance, promotion-track guidance, absence of discipline, and the inconsistency between prior praise and an abrupt termination.

232.    As a direct and proximate result of Benchling's unlawful retaliation, Plaintiff suffered lost wages and benefits, lost commissions and equity value, emotional distress, reputational harm, and diminished professional opportunities. Plaintiff is entitled to all remedies available under § 78u-6(h)(1)(C), including:

    a.   reinstatement (or front pay);

    b.   two times (2x) back pay with interest;

    c.   compensation for litigation costs, expert witness fees, and attorney's fees; and

    d.   all other relief the Court deems appropriate.

## XIX - XXV — PRIVACY, SURVEILLANCE, AND  INTERCEPTION

## COUNT XIX — FEDERAL WIRETAP ACT

### (18 U.S.C. § 2511)

233.    Plaintiff realleges and incorporates all preceding paragraphs.

234.    Defendant Benchling, Inc. intentionally intercepted, endeavored to intercept, and procured the interception of Plaintiff's wire and electronic communications through a Salesloft-based call-recording system configured to record calls by default and without disclosure or consent. Benchling used software and devices to capture the contents of Plaintiff's telephone communications—including full audio, metadata, and associated identifiers—during the course of his employment.

235.    These recordings captured both the substance and meaning of Plaintiff's spoken words, satisfying the statutory definition of 'contents' under 18 U.S.C. § 2510(8).

236.    Benchling's Salesloft configuration captured Plaintiff's communications contemporaneously with their transmission, satisfying the statutory definition of "intercept" under 18 U.S.C. § 2510(4). The recordings were initiated at call-start, captured live audio streams in real time, and were not limited to post-transmission storage, thereby meeting the contemporaneity requirement recognized by federal courts interpreting the Wiretap Act.

237.    The interceptions were not made in the "ordinary course of business" within the meaning of 18 U.S.C. § 2510(5)(a)(i). Benchling provided no disclosure of call recording, no quality-assurance justification, and no customer-service necessity. The recordings were used for internal surveillance, analytics, and performance scoring, not customer-facing operational functions. Salesloft's own Master Subscription Agreement prohibits unlawful or undisclosed recording, underscoring that Benchling's surveillance exceeded any permissible business purpose.

238.    The interceptions were undertaken for internal monitoring, managerial analytics, and performance evaluation, and were not incident to the ordinary course of business. Benchling knew Plaintiff had not consented, and Plaintiff never authorized interception, disclosure, or use of his communications under federal or state law. Benchling further disclosed and used the unlawfully recorded communications in violation of 18 U.S.C. § 2511(1)(c)–(d), including by reviewing, storing, analyzing, and transmitting audio recordings and metadata to managers and internal systems.

239.    Each recorded call constitutes a separate violation of § 2511. As a direct result, Plaintiff is entitled to statutory damages of not less than $10,000 per violation or $100 per day of violation (whichever is greater), punitive damages, equitable relief, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 2520.

## COUNT XX — STORED COMMUNICATIONS ACT (SCA) – AUDIO RECORDINGS

### (SCA, 18 U.S.C. §§ 2701–2707)

240.    Plaintiff realleges and incorporates all preceding paragraphs.

241.    Defendant Benchling, Inc. intentionally accessed, and exceeded its authorized access to, electronic communications in electronic storage on Salesloft and related systems, in violation of 18 U.S.C. § 2701(a). Benchling configured its systems to automatically store full audio recordings, metadata, and associated electronic identifiers of Plaintiff's calls without his knowledge or consent. Plaintiff never authorized Benchling to intercept, store, retrieve, or review the contents of these communications.

242.    Benchling is not a 'remote computing service' or 'electronic communication service' under 18 U.S.C. § 2510(15)–(14) with respect to SDR call data; Salesloft is the service provider. Benchling was an end user and exceeded authorized access.

243.    Benchling acted solely as an end user of Salesloft's communication platform and therefore possessed no service-provider authority to access, retrieve, or utilize stored communications. Any access beyond the authorization granted to ordinary end users constitutes "exceeding authorized access" under 18 U.S.C. § 2701(a)(2), reinforcing that Defendant's conduct falls squarely within the SCA's prohibited category.

244.    Salesloft's storage of call recordings and metadata constitutes "electronic storage" within the meaning of 18 U.S.C. § 2510(17). Benchling's retrieval, review, and use of Plaintiff's stored communications—conducted for surveillance, monitoring, and performance analytics rather than for any legitimate business or service-provider function—occurred without valid authorization and exceeded any permissible scope of access.

245.    Benchling's unauthorized access, retrieval, and use of stored communications violated 18 U.S.C. § 2701(a)(1) and (a)(2). Benchling also knowingly divulged the contents and metadata of these stored communications to supervisors, internal systems, and decision-makers in violation of 18 U.S.C. § 2702(a).

246.    Each access constitutes a separate violation of the Act. Pursuant to 18 U.S.C. § 2707, Plaintiff is entitled to statutory damages of at least $1,000 per violation, punitive damages, equitable relief requiring preservation and production of all stored communications and metadata, and reasonable attorneys' fees and costs.

## COUNT XXI — MASSACHUSETTS WIRETAP ACT - INTERCEPTION

### (M.G.L. c. 272 § 99)

247.    Plaintiff realleges and incorporates all preceding paragraphs.

248.    Defendant Benchling, Inc. knowingly, willfully, and without consent intercepted and recorded the contents of Plaintiff's telephone communications while Plaintiff was physically present in Massachusetts, in violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. Massachusetts is an all-party-consent jurisdiction, and no party to the relevant calls—including Plaintiff, customers, prospects, or internal collaborators—received any notice that calls were being recorded, nor provided any consent, express or implied.

249.    Benchling configured its Salesloft dialer and related systems to operate in continuous, default-record mode, capturing the contents of all outgoing and incoming calls initiated or received by Plaintiff. This surveillance was not part of any "ordinary course of business" exception within the meaning of § 99(B)(4); it was a discretionary analytics setting used for monitoring and performance scrutiny.

250.    The absence of any disclosure or audible indicator renders the interceptions 'secret' within the meaning of § 99.

251.    Each recorded call constituted a separate unlawful "interception" under § 99(C)(1). Benchling's subsequent access, review, and use of those recordings further violated § 99(C)(3). Benchling acted knowingly and intentionally, and its California-based leadership directed, approved, or ratified the interception practices.

252.    As a direct and proximate result of Defendant's violations, Plaintiff suffered loss of privacy, emotional distress, and other compensable injuries. Pursuant to M.G.L. c. 272 § 99(Q),

Plaintiff is entitled to actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs.

## COUNT XXII — MASSACHUSETTS RIGHT OF PRIVACY - INVASION
## (M.G.L. c. 214 § 1B)

253.    Plaintiff realleges and incorporates all preceding paragraphs.

254.    Defendant Benchling, Inc. intentionally and unreasonably interfered with Plaintiff's privacy in violation of M.G.L. c. 214 § 1B by secretly recording, storing, accessing, and reviewing his telephone communications without notice, consent, or legitimate business necessity. These intrusions captured the substance of Plaintiff's daily interactions with customers, colleagues, managers, and prospects while he was physically present in Massachusetts.

255.    Benchling's leadership—fully aware that Plaintiff was managing serious anxiety, depression, and related medical conditions—nonetheless subjected him to continuous, covert monitoring that foreseeably exacerbated his symptoms. Supervisors accessed and used these recordings to evaluate and scrutinize his performance without disclosure, leveraging the surveillance to exert pressure and control while concealing the existence of the recordings themselves.

256.    The secret monitoring served no operational need, was not proportionate to any legitimate employer interest, and far exceeded the bounds of conduct that a reasonable employee would expect. It constituted a serious, highly offensive intrusion that would cause distress to any reasonable person, and caused Plaintiff specific emotional harm, humiliation, and increased anxiety.

257.    As a result of Defendant's violation of M.G.L. c. 214 § 1B, Plaintiff suffered emotional

distress, reputational harm, and other compensable injuries. Plaintiff is entitled to compensatory

and punitive damages, together with reasonable attorneys' fees and costs.


## COUNT XXIII — CALIFORNIA INVASION OF PRIVACY ACT — INTERCEPTION

### (Cal. Penal Code § 631)

258.    Plaintiff realleges and incorporates all preceding paragraphs.

259.    Defendant Benchling, Inc., a California-based corporation, violated Cal. Penal Code §

631 by intentionally and without consent intercepting, monitoring, and using Plaintiff's

telephone communications through Salesloft's default recording and analytics system. Benchling

configured, enabled, and operated the interception technology from California, and its California

executives and managers accessed and benefitted from the recordings.

260.    Benchling contemporaneously "tapped" or otherwise acquired the contents of Plaintiff's

real-time communications—capturing customer calls, internal discussions, performance-related

exchanges, and prospect interactions—without any notice, disclosure, or consent from Plaintiff

or any call participant. The interceptions were not made in the ordinary course of business and

served no legitimate operational necessity. Rather, they were undertaken for clandestine

analytics, surveillance, and managerial evaluation purposes.

261.    Benchling knowingly used, reviewed, and stored the unlawfully intercepted

communications, and used those recordings to evaluate and scrutinize Plaintiff's performance

while concealing the existence of the recording program. Because Benchling is a California

entity directing the interception from California systems, § 631 applies extraterritorially to its

conduct regardless of Plaintiff's location.

262.    The recording and interception systems were configured, enabled, and administered on servers located in California and controlled by California-based executives. Because the unlawful conduct occurred, originated, and was exploited within California, CIPA applies extraterritorially under Kearney v. Salomon Smith Barney, 39 Cal. 4th 95 (2006), regardless of Plaintiff's physical location when the calls were placed.

263.    Each intercepted call constitutes a separate violation of CIPA § 631, entitling Plaintiff to statutory damages of $5,000 per violation or treble actual damages, together with punitive damages and attorneys' fees.

## COUNT XXIV — CALIFORNIA INVASION OF PRIVACY — RECORDING

### (Cal. Penal Code §§ 632, 632.7)

264.    Plaintiff realleges and incorporates all preceding paragraphs.

265.    Defendant Benchling, Inc., acting from California and through California-based executives, violated Cal. Penal Code §§ 632 and 632.7 by intentionally recording Plaintiff's oral and telephonic communications—including cellular, VoIP, and internet-based calls—without the knowledge or consent of Plaintiff or any other participant.

266.    Benchling configured its Salesloft system to record calls automatically, without disclosure, audible warnings, pre-call notices, or written acknowledgment. These communications included sensitive discussions with customers, prospects, colleagues, and managers, all of which constitute "confidential communications" within the meaning of § 632 because the parties reasonably expected that no one was secretly recording or monitoring their conversations.

267.    For calls placed or received on cellular, VoIP, or other wireless channels, Benchling

violated § 632.7 by recording and accessing those transmissions without consent. The statutory

protections of § 632.7 apply regardless of any expectation of confidentiality; recording a

wireless/cellular call without consent is categorically unlawful under California law.

268.    Benchling's California-based leadership designed, enabled, and ratified the surveillance

program, accessed the recordings from within California, and benefited from their use in

performance evaluation and analytics. Because the recording activity was directed, controlled,

and exploited from California, §§ 632 and 632.7 apply to the interceptions even when Plaintiff

was located in Massachusetts.

269.    Each recorded call constitutes a separate violation, and Plaintiff is entitled to statutory

damages of $5,000 per violation under § 637.2, or treble actual damages, as well as punitive

damages and attorneys' fees based on Defendant's intentional and clandestine misconduct.


## COUNT XXV — CALIFORNIA CONSTITUTIONAL PRIVACY

### (Cal. Const. art. I, §1)

270.    Article I, § 1 of the California Constitution guarantees every person an inalienable right

to privacy. This provision is self-executing and confers a private right of action for damages and

equitable relief against private entities whose conduct constitutes a serious invasion of a legally

protected privacy interest.

271.    Plaintiff possessed legally protected privacy interests in the confidentiality of his

telephone communications, his workplace conversations, and the integrity of his personal and

professional interactions. These interests are objectively reasonable and widely recognized,

including under federal and state privacy law, industry norms, and the explicit restrictions

imposed by the Massachusetts and California wiretap statutes, the Federal Wiretap Act, and the Stored Communications Act.

272.    Plaintiff had a reasonable expectation of privacy in his telephone calls and work-related conversations, including calls with customers, prospects, colleagues, and supervisors. Plaintiff was not notified that Benchling had enabled default-on recording through the Salesloft platform; no audible tone, banner disclosure, written notice, or system warning indicated that his communications were being intercepted, recorded, stored, or later accessed for managerial review.

273.    Benchling intentionally, continuously, and without disclosure intercepted, recorded, stored, and accessed Plaintiff's telephone communications while he was physically located in Massachusetts and while calls originated from or terminated in Massachusetts and California. Benchling's senior leadership—including California-based decisionmakers responsible for configuring Salesloft and enforcing its use—authorized, ratified, or recklessly ignored this unlawful interception.

274.    Benchling's conduct constituted a serious invasion of Plaintiff's privacy. The company deployed a clandestine, automated surveillance system capturing sensitive professional communications for internal analytics, monitoring, and personnel oversight. These recordings were used for evaluation, pipeline analysis, and performance scrutiny without Plaintiff's knowledge or consent.

275.    The invasion was highly offensive to a reasonable person and violated established privacy norms. Benchling's continuous, undisclosed, default-on recording of employee and customer calls was unnecessary to its core operations, exceeded any legitimate business purpose, and occurred despite industry-standard requirements for multi-party consent. Benchling could

have achieved any legitimate objective—such as training or quality assurance—through lawful, disclosed, consent-based recording practices.

276. Benchling's conduct was not justified by any legitimate or compelling business interest. Any claimed justification is pretextual, as the company could have achieved its objectives through significantly less intrusive means, including opt-in call recording, training-specific sessions, or explicit informed disclosure consistent with California and Massachusetts legal requirements.

277. As a direct and proximate result of these undisclosed surveillance practices, Plaintiff suffered:

    a. violation of constitutionally protected privacy rights;

    b. emotional distress, anxiety, and exacerbation of pre-existing conditions;

    c. reputational and professional harm;

    d. economic loss, including lost wages, commissions, advancement opportunities, and future earning capacity;

    e. loss of bargaining power and increased costs associated with discovering, documenting, and remedying the unlawful interception.

278. Benchling's acts were willful, knowing, oppressive, and conducted with conscious disregard for Plaintiff's constitutional rights. Plaintiff is therefore entitled to compensatory damages, punitive damages where permitted, equitable and injunctive relief, statutory penalties via incorporated statutes, disgorgement of profits attributable to the unlawful recording, attorneys' fees as allowable by law, and all additional relief this Court deems just and proper.

### XXVI - XXVIII – CORPORATE FIDUCIARY AND SHAREHOLDER

### COUNT XXVI — DIRECT SHAREHOLDER FIDUCIARY BREACH

**(Delaware Common Law)**

279.    Plaintiff realleges and incorporates all preceding paragraphs.

280.    Plaintiff exercised his vested incentive stock options on December 7, 2022, thereby becoming a direct shareholder of Benchling, Inc., a Delaware corporation. As a shareholder, Plaintiff was owed fiduciary duties of loyalty, care, good faith, and candor by Benchling's directors and officers.

281.    Post-termination, Benchling's senior leadership used Plaintiff's vested equity rights as leverage to coerce a general release of claims, falsely asserting that Plaintiff's vested options would be "disqualified" unless he executed a severance agreement. Such threats served no legitimate corporate purpose and were undertaken to protect officers and insiders from legal exposure.

282.    Benchling failed to implement or maintain basic compliance and oversight systems. The company operated an unlawful default-on call-recording system in violation of state and federal wiretap laws; lacked internal controls sufficient to detect or prevent these violations; and failed to preserve critical electronically stored information—including the "Benchling Offer Illustrator" file—after litigation became reasonably foreseeable. The company also maintained inaccurate or misleading financial metrics, including artificially inflated enterprise pipeline values mandated by corporate policy, which undermined the reliability of internal reporting and impaired shareholders' ability to assess corporate performance. These failures constitute a *Caremark*-type breach.

283.   Under *Stone v. Ritter,* 911 A.2d 362, 370 (Del. 2006), oversight liability attaches when directors consciously fail to implement or monitor systems for legal compliance. Benchling's failure to institute controls to detect unlawful surveillance, prevent spoliation of corporate records, or ensure accurate financial metrics reflects precisely the type of sustained, bad-faith inaction condemned in *Caremark* and its progeny.

284.   Benchling knowingly engaged in or approved conduct that violated clear legal obligations, including secret call interception, concealment of surveillance practices, spoliation and alteration of business records, financial-metrics manipulation, and intentional coercion of a former employee-turned-shareholder. Such conduct reflects a conscious disregard of known legal duties and a bad-faith failure to act in the corporation's best interests.

285.   Benchling made materially false, misleading and/or obstructive statements to Plaintiff concerning:

    a.  the existence and accessibility of key internal records;

    b.  the legal consequences of declining to sign a release; and

    c.  Plaintiff's vested equity rights, including knowingly false statements regarding "disqualification."

286.   A corporation may not speak falsely or misleadingly to its shareholders, and the dissemination of incorrect and incomplete information violates the duty of candor under *Malone v. Brincat*, 722 A.2d 5 (Del. 1998).

287.   Benchling insiders used confidential information—including unlawfully intercepted communications, internal HR data, and manipulated performance metrics—to advance personal or institutional interests at Plaintiff's expense, including manufacturing termination justifications

and exerting coercive pressure to obtain a broad release of claims. This constitutes *Brophy*-type fiduciary misconduct.

288.    These acts constitute classic breaches of the duty of loyalty under *Guth v. Loft, Inc*., 5 A.2d 503, 510 (Del. 1939), because corporate fiduciaries may not use corporate authority, confidential information, or shareholder-dependent leverage to advance their own interests at the expense of the stockholder. Benchling's effort to condition Plaintiff's shareholder rights on execution of a liability release violated this fundamental principle.

289.    Plaintiff suffered individualized harm distinct from any injury to Benchling as a corporation, including:

  a.  impairment and threat to the exercise of his vested equity rights;

  b.  diminution in the value of his equity interest due to inaccurate internal metrics and compliance failures;

  c.  deprivation of truthful information necessary to make informed decisions as a shareholder;

  d.  coercive restrictions on the exercise and enjoyment of shareholder rights; and

  e.  litigation prejudice resulting from spoliation and concealment of corporate records.

  f.  These injuries are direct and personal to Plaintiff in his capacity as a shareholder, not derivative of generalized corporate harm.

290.    These injuries are direct under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), because they arise from individualized coercion, the impairment of Plaintiff's own vested equity rights, and the denial of truthful information uniquely owed to Plaintiff as a specific shareholder, not from any injury suffered equally by all stockholders.

291.    As a direct and proximate result of these fiduciary breaches, Plaintiff has suffered

damages including economic loss, impaired shareholder rights, and diminution in the value of his

equity interest. Plaintiff seeks compensatory damages, equitable and declaratory relief, fee

shifting, disgorgement of benefits obtained through fiduciary breach, and all other relief the

Court deems just and proper.

## COUNT XXVII — DECLARATORY AND EQUITABLE RELIEF REGARDING

## SHAREHOLDER RIGHTS AND FEDERAL FORUM SELECTION CLAUSE

### (28 U.S.C. § 2201; 8 Del. C. § 220)

292.    Plaintiff realleges and incorporates all preceding paragraphs.

293.    Plaintiff, as a shareholder of Benchling, Inc., possesses statutory and common-law rights

to truthful corporate disclosures, preservation of books and records, and protection of his equity

interests under Delaware law, including rights enforceable under 8 Del. C. § 220.

294.    Benchling's directors and officers owe fiduciary duties of loyalty, care, good faith, and

candor to the corporation and its shareholders. These duties include maintaining adequate

internal controls, complying with legal requirements, and avoiding conduct that exposes the

corporation to unnecessary litigation and regulatory risk.

295.    Benchling's officers and directors breached these obligations by:

    a.  enabling and maintaining unlawful interception and recording of communications;

    b.  failing to implement or enforce basic compliance systems;

    c.  concealing, altering, or deleting electronically stored information after litigation

       became reasonably foreseeable; and

    d.  exposing the company to substantial liability under federal and state privacy

       statutes.

296.    This misconduct directly threatens shareholder value by increasing financial, regulatory, and reputational risk, undermining investor confidence, and impairing the integrity of corporate governance systems.

297.    The Equity Incentive Plan and related grant instruments contain a federal forum-selection clause designating federal courts as the proper venue for resolving disputes arising from or relating to the company's internal affairs, fiduciary conduct, equity rights, and associated governance matters. This action falls squarely within the scope of that clause.

298.    An actual controversy therefore exists under 28 U.S.C. § 2201 regarding Plaintiff's rights as a shareholder, the corporation's duties to maintain and produce records, the validity and enforceability of the federal forum-selection clause, and the Court's continuing jurisdiction over these issues.

299.    Plaintiff seeks declaratory and equitable relief confirming that:

    a.  Benchling must preserve, maintain, and produce all relevant books, records, and ESI, and refrain from further spoliation or concealment;

    b.  the federal forum-selection clause in Benchling's Equity Plan is valid and enforceable, and this Court is the proper forum for adjudicating related shareholder and fiduciary-governance disputes; and

    c.  the Court retains authority to enforce Plaintiff's shareholder rights, prevent further fiduciary breaches, and order such equitable relief as necessary to protect the value and integrity of Plaintiff's equity investment.

300.    Plaintiff further requests all appropriate equitable remedies, including injunctive relief, preservation orders, corrective disclosures, and fee shifting as permitted under Delaware and federal law.

## COUNT XXVIII — BREACH OF FIDUCIARY DUTY – CORPORATE GOVERNANCE FAILURE

### (Delaware Common Law)

301.    Plaintiff realleges and incorporates all preceding paragraphs.

302.    Plaintiff became a shareholder of Benchling, Inc. upon exercising his vested incentive stock options ("ISOs") in December 2022, thereby acquiring enforceable rights under Delaware law to truthful corporate disclosures, the preservation of material corporate records, and the loyalty and good faith of those managing the corporation.

303.    Benchling's officers, HR personnel, and other agents owed fiduciary duties of loyalty, care, and good faith to Plaintiff in his capacity as a stockholder because their conduct directly affected his vested equity interests, information rights, and the economic value of his holdings.

304.    Benchling also failed to provide mandatory Rule 701(e) financial disclosures upon Plaintiff's ISO exercise, constituting an independent breach of the fiduciary duties of candor and good faith.

305.    Immediately following Plaintiff's termination, Benchling engaged in a coordinated campaign to coerce Plaintiff into executing a broad general release of claims, including ADA, FMLA, PFMLA, and privacy causes of action. This campaign included:

    a.    Conditioning COBRA assistance, administrative access, and purported "extensions" on execution of a liability waiver;

    b.    Threatening that Plaintiff's vested ISOs would be "disqualified" unless he signed, despite knowing the 2013 Stock Plan unconditionally provided a three-month post-termination exercise window;

    c.   Issuing repeated arbitrary signature deadlines and escalating pressure despite Plaintiff's express refusal to waive claims; and

    d.   Leveraging Plaintiff's equity, benefit rights, and access to corporate information to extract litigation concessions.

306.    These representations were knowingly false. HR ultimately conceded that ISO exercise rights were unaffected by whether Plaintiff signed a release, confirming that the threats were pretextual and were deployed to secure an improper waiver of statutory claims.

307.    This misconduct constituted bad-faith self-dealing, improper use of corporate authority, and a breach of the fiduciary duty of loyalty, because it prioritized Benchling's institutional and litigation interests over the lawful governance of the corporation and the rights of its shareholders.

308.    Benchling further breached its fiduciary obligations by failing to preserve critical electronically stored information ("ESI") material to contract formation, surveillance practices, and retaliation, including the deletion of the "Benchling Offer Illustrator," a file central to the validity of any purported arbitration agreement and to Plaintiff's ability to value his equity holdings. The deletion also constitutes a breach of the fiduciary duty of candor and the duty of good faith. Delaware law, including *Malone v. Brincat*, 722 A.2d 5 (Del. 1998), and *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27 (Del. 2006), recognizes that corporate fiduciaries must preserve and disclose truthful corporate information and may not impair stockholders' ability to evaluate or vindicate their rights. The deletion of this document reflects bad-faith misconduct actionable under Delaware law.

309.    These acts impaired Plaintiff's corporate rights, distorted the economic value of his shares, and exposed him to coercive leverage at the precise moment Benchling knew litigation

was imminent. They also increased Benchling's litigation and regulatory exposure, thereby harming shareholder value more broadly.

310.     As a direct and proximate result of Defendant's breaches of fiduciary duty, Plaintiff suffered cognizable injuries as a shareholder, including:

      a. loss of access to truthful corporate information;

      b. coercive impairment of vested equity rights;

      c. increased litigation and regulatory risk artificially imposed on the corporation; and

      d. diminution of shareholder value associated with governance failures and ESI spoliation.

311.     To the extent any portion of this Count is deemed derivative rather than direct, Plaintiff pleads this claim in the alternative pursuant to Fed. R. Civ. P. 8(d). Demand on the Benchling Board would have been futile because the directors and officers (i) participated in, authorized, or knowingly permitted the misconduct described herein; (ii) face a substantial likelihood of personal liability for breaches of the duties of loyalty, oversight, candor, and good faith; and (iii) lacked independence due to their involvement in the coercive severance campaign, unlawful surveillance practices, and spoliation of critical corporate records. Accordingly, any demand would have been futile under Delaware law, and Plaintiff may properly maintain this claim on a derivative basis to the extent the Court deems it derivative.

312.     Plaintiff is entitled to all available legal and equitable relief, including rescission, disgorgement, compensatory damages, punitive damages, corporate-governance remedies, and such other relief as the Court deems just and proper.

## XXIX - XXX —  COMMON LAW

### COUNT XXIX — PROMISSORY ESTOPPEL

**(Massachusetts Common Law)**

313.    Plaintiff realleges and incorporates all preceding paragraphs.

314.    Benchling, acting through SDR Manager Christian Haas-Kwon, made repeated and definite representations that Plaintiff would be advanced into an Account Executive or comparable preferred role in or around December 2022, based on Plaintiff's documented performance, pipeline production, activity metrics, skills, and tenure benchmarks. These assurances were specific, time-anchored, and reinforced through directives that Plaintiff should "be prepared for promotion" in that timeframe and anticipate imminent advancement. Plaintiff reasonably relied on these representations by remaining in his role, declining alternative employment opportunities, and investing substantial additional effort to satisfy the criteria Benchling identified as the conditions precedent to promotion.

315.    Defendant knew or should have known that Plaintiff would rely on these assurances, and Plaintiff's reliance was foreseeable and reasonable under the circumstances. Benchling's failure to honor the promised promotion—and its subsequent termination of Plaintiff shortly after he satisfied the stated requirements—rendered Plaintiff's reliance detrimental.

316.    No similarly situated Sales Development Representative with equivalent or inferior performance metrics, tenure, or pipeline contribution was terminated during this period, and employees with objectively weaker results remained employed and eligible for advancement.

Plaintiff alone was removed despite meeting the criteria Benchling identified for promotion, further confirming that Plaintiff reasonably relied on Defendant's assurances to his detriment.

317.    Injustice can be remedied only by enforcing Defendant's promises. Plaintiff is therefore entitled to compensatory damages and all other relief the Court deems just and proper.

## RELIEF REGARDING ARBITRATABILITY

318.    Plaintiff requests a prompt, pre-merits determination by the Court on contract formation and enforceability of any arbitration or delegation clause; limited discovery targeted to formation (offer timeline; DocuSign audit trails and envelope metadata; distribution communications; HR onboarding scripts and training materials); production of the original "Benchling Offer Illustrator" or forensic accounting thereof; and an evidentiary hearing.

319.    If, contrary to Plaintiff's position, arbitration is compelled, Plaintiff requests a conditional order requiring Defendant to advance all forum and arbitrator fees and costs, and preserving court jurisdiction to enforce statutory fee-shifting and injunctive remedies.

## COUNT XXX — DECLARATORY JUDGMENT REGARDING ARBITRATION

### (28 U.S.C. § 2201; Federal Arbitration Act § 2; Massachusetts contract law)

320.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

321.    An actual, ripe controversy exists concerning whether Plaintiff ever agreed to arbitrate any dispute with Defendant, and whether Defendant can meet its burden to demonstrate a valid agreement to arbitrate or to delegate arbitrability.

322.    Under *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 296–99 (2010), a court must decide questions of contract formation before compelling arbitration or enforcing any alleged delegation clause. The FAA "does not require parties to submit to arbitration any dispute which they have

not agreed so to submit," and courts may not refer a case to arbitration unless and until a valid

agreement exists. Because Defendant cannot demonstrate mutual assent to arbitration at the

moment of contract formation, the issue of arbitrability is a threshold judicial question that must

be resolved by this Court alone.

323.    No mutual assent—The parties formed their employment agreement on April 28, 2021,

based on the terms conveyed in the pre-onboarding offer materials. The later DocuSign bundle

embedded a boilerplate arbitration paragraph mid-packet, without separate presentation,

explanation, opt-out opportunity, or informed consent. Plaintiff completed the DocuSign

sequence as a mandatory administrative gateway to payroll and HR systems, not as an agreement

to waive access to judicial forums. No knowing or voluntary assent was given.

324.    Lack of consideration—Any arbitration obligation introduced after contract formation is

unenforceable absent fresh consideration, which Defendant never provided.

325.    To the extent Defendant relies on any California choice-of-law language embedded in the

DocuSign packet, such reliance fails under Restatement (Second) of Conflict of Laws § 187(2).

Massachusetts has a materially greater interest in the formation of employment agreements for

work performed in Massachusetts, and California's arbitration-favoring doctrines would impair

fundamental Massachusetts public policies protecting workers from post-acceptance adhesion

terms unsupported by consideration. Accordingly, Massachusetts law governs contract formation

and enforceability notwithstanding any contrary boilerplate embedded within the post-formation

onboarding materials.

326.    Procedural unconscionability—The arbitration language was buried within a

multi-document onboarding sequence, presented on a take-it-or-leave-it basis, and imposed at a

time when Plaintiff had no bargaining power, counsel advisement, or meaningful notice. No clear

and unmistakable delegation clause exists, and Defendant did not provide the JAMS Rules or identify any delegation authority, defeating any claim that arbitrability was delegated to an arbitrator.

327.    Substantive unconscionability—The purported arbitration obligation (and any claimed delegation clause) is structurally one-sided, imposes costs disproportionate to Plaintiff's financial position, restricts discovery essential to vindicating statutory rights, and operates in practical effect as a waiver of federally protected claims—including claims involving allegations of financial-metric manipulation, internal-controls failures, and the destruction or concealment of electronically stored information.

328.    At no point did Benchling state—verbally, in writing, in the DocuSign materials, or in any other communication—that accepting arbitration was a condition of employment or continued employment. Plaintiff was never informed that refusing arbitration was permitted, and the onboarding workflow presented no mechanism to decline or modify the provision. Benchling's silence on this point defeats any claim of consideration based on "continued employment" and underscores the non-consensual nature of the purported arbitration term.

329.    Even if an arbitration clause had been properly presented—which it was not—any purported obligation would remain unenforceable under the FAA's § 2 saving clause. The FAA preserves all generally applicable state-law defenses to contract enforcement, including lack of mutual assent, failure of consideration, procedural and substantive unconscionability, and public-policy limitations. Massachusetts contract doctrine further prohibits enforcement of post-formation waivers or adhesion clauses that strip statutory employment protections. Defendant's attempted reliance on a buried, post-acceptance arbitration paragraph violates these principles and falls squarely within the FAA's saving clause.

330.    Public-policy constraints—Federal law contains strong anti-waiver and anti-retaliation protections designed to ensure judicial adjudication of disputes involving securities-related misconduct, data-integrity objections, falsified performance metrics, and the alteration or destruction of business records. Courts consistently hold that private arbitration provisions may not be enforced where doing so would undermine these statutory protections or frustrate congressional intent to ensure transparency, accountability, and access to federal courts for matters implicating misuse of corporate records or internal-controls deficiencies. The allegations in this action fall squarely within these protected categories.

331.    Formation-evidence spoliation—The central pre-DocuSign offer file—known internally as the "Benchling Offer Illustrator"—has been deleted from Defendant's Google Workspace environment. That file is the operative record reflecting compensation terms, equity structure, and the parties' actual negotiations at the moment of contract formation. Defendant's failure to preserve this formation-critical ESI, despite clear foreseeability of litigation, prevents Defendant from satisfying its burden to establish the existence of any valid arbitration agreement.

332.    Declaratory relief warranted—Given Defendant's lack of proof of assent, unconscionability in both procedure and substance, public-policy limitations on the arbitrability of claims involving financial-record integrity and the destruction of formation evidence, and Defendant's inability to authenticate any valid arbitration term, Plaintiff seeks a declaration that no enforceable agreement to arbitrate exists and that all claims in this action must proceed in court.

## **PRAYER FOR RELIEF**

333.    WHEREFORE, Plaintiff Julian Ross respectfully requests that This Court enter judgment in his favor and against Defendant Benchling, Inc., and grant the following relief:

334.    Economic Damages: Award Plaintiff all economic losses resulting from Defendant's unlawful conduct, including back pay, front pay, lost wages, lost commissions, lost benefits, and lost future earnings.

335.    Liquidated damages under the Family and Medical Leave Act, 29 U.S.C. § 2617(a).

336.    Mandatory treble damages under the Massachusetts Paid Family and Medical Leave Act, M.G.L. c. 175M § 9(f), and M.G.L. c. 149 § 150.

337.    Compensatory Damages: Award compensatory damages for emotional distress, mental anguish, reputational harm, diminished professional standing, and all other non-economic harms recoverable under the ADA, FMLA, PFMLA, M.G.L. c. 151B, FEHA/CFRA, and applicable privacy laws.

338.    Punitive Damages — Award punitive damages to punish and deter Defendant's willful, malicious, or reckless violations of:

    a.  the Americans with Disabilities Act;

    b.  Massachusetts General Laws c. 151B;

    c.  California FEHA/CFRA;

    d.  the California Invasion of Privacy Act (CIPA §§ 631, 632, 632.7);

    e.  the Massachusetts Privacy Statute; and

    f.  all relevant common-law tort and fiduciary-duty doctrines.

339.    Federal Privacy Statutory Damages:

    a.  Statutory damages of not less than $10,000 per violation, or $100 for each day of violation, whichever is greater, under the Federal Wiretap Act, 18 U.S.C. § 2520.

    b.  Statutory damages of not less than $1,000 per violation, plus punitive damages, under the Stored Communications Act, 18 U.S.C. § 2707.

340.    Massachusetts Privacy Damages: Award actual and punitive damages under M.G.L. c. 272 § 99 and M.G.L. c. 214 § 1B for unlawful interception and invasion of privacy.

341.    California Privacy Damages: Award statutory damages of $5,000 per violation, plus punitive damages, under CIPA §§ 631, 632, and 632.7, and compensatory damages under Article I, § 1 of the California Constitution.

342.    Injunctive and Equitable Relief:

   a.    Require Defendant to revise its employment, accommodation, leave-handling, surveillance, and data-retention practices to comply with federal and state law.

   b.    Order preservation and production of all relevant electronically stored information (ESI), including call-recording metadata and configuration logs.

   c.    Impose appropriate corporate-governance and fiduciary-compliance remedies.

   d.    Prohibit any further unlawful interception, access, storage, or use of communications.

343.    Declaratory Relief:

   a.    Declare that no valid arbitration agreement was formed between the parties; or, in the alternative,

   b.    Declare that any purported arbitration or delegation clause is unconscionable and unenforceable;

   c.    Declare Plaintiff's shareholder and equity-instrument rights intact and enforceable.

344.    Conditional Relief if Arbitration Is Compelled:

   a.    Require Defendant to pay all arbitration-forum and arbitrator fees;

   b.    Preserve Plaintiff's access to all statutory and equitable remedies;

      c.   Retain jurisdiction to enforce such relief.

345.   Attorneys' Fees and Costs: Award reasonable attorneys' fees and costs pursuant to:

      a.   42 U.S.C. § 12205 (ADA);

      b.   29 U.S.C. § 2617(a)(3) (FMLA);

      c.   M.G.L. c. 151B § 9;

      d.   M.G.L. c. 175M § 9(f) and M.G.L. c. 149 § 150;

      e.   18 U.S.C. §§ 2520 and 2707;

      f.   Applicable California statutes including FEHA/CFRA and CIPA.

346.   Interest: Award pre-judgment and post-judgment interest as permitted by law.

347.   Other Relief — Award such other and further relief as the Court deems just and proper.

## **RESERVATION OF RIGHTS RE: ESI REMEDIES**

Plaintiff reserves all rights to seek sanctions, adverse inferences, and other curative measures under Fed. R. Civ. P. 37(e) and this Court's inherent authority. Plaintiff may move for appropriate relief arising from Defendant's failure to preserve relevant electronically stored information ("ESI"), including call-recording metadata, configuration logs, internal communications, and documents material to contract formation, surveillance practices, and the claims asserted herein. Plaintiff seeks adverse-inference instructions or evidentiary sanctions under Fed. R. Civ. P. 37(e)(2) upon a finding that Defendant acted with intent to deprive Plaintiff of the use of electronically stored information in this litigation.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims and issues so triable as of right.

Plaintiff expressly denies having executed, agreed to, or knowingly and voluntarily assented to

any purported waiver of the right to a jury trial, including any alleged arbitration or delegation provision improperly asserted by Defendant. Plaintiff preserves and asserts the full constitutional and statutory right to have a jury determine all factual disputes in this action.

Dated: November 13, 2025

Respectfully Submitted,

**PLAINTIFF, PRO SE**

/s/ Julian Ross
Julian Ross
105 East Street - Apt. B
Hadley, MA  01035
Telephone: 413-531-9810
E-mail: jross21@gmail.com